# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Tony J. Walton,**
**Petitioner Below, Petitioner**

**FILED**

February 9, 2015

RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 14-0196** (Fayette County 12-C-330)

**David Ballard, Warden,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner Tony J. Walton, by counsel Thomas Kupec, appeals the Circuit Court of Fayette County's February 3, 2014, order that denied his petition for writ of habeas corpus. Respondent David Ballard, Warden, by counsel Julie Warren, filed a response and a supplemental appendix. Petitioner filed a reply and a supplemental appendix. On appeal, petitioner argues that the circuit court erred in denying his petition for writ of habeas corpus because he received ineffective assistance of counsel.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In May of 2009, a Fayette County Grand Jury indicted petitioner on one count of first degree robbery and one count of assault during the commission of a felony. The indictment alleged that petitioner robbed a Family Dollar store and assaulted the manager. Following a two-day trial, the jury convicted petitioner of one count of first degree robbery and one count of assault during the commission of a felony. Thereafter, the circuit court sentenced petitioner to a term of incarceration of fifty years for one count of first degree robbery pursuant to West Virginia Code § 61-2-12, and a consecutive term of two to ten years for one count of assault during the commission of a felony pursuant to West Virginia Code § 61-2-10.

In June of 2010, petitioner filed a direct appeal arguing that the circuit court erred in failing to instruct the jury on intimidation. This Court refused petitioner's direct appeal. In June of 2012, petitioner filed an original jurisdiction petition for writ of habeas corpus with this Court arguing ineffective assistance of trial counsel. By order entered September 20, 2012, this Court refused petitioner's original jurisdiction petition.

On October 29, 2012, petitioner filed a petition for writ of habeas corpus in circuit court

1

asserting the following grounds for relief: 1) nine separate grounds of ineffective assistance of counsel; 2) denial of his right to a trial by his peers; 3) improper use of a photo line-up; 4) denial of his right to a fair and impartial jury; 5) improper jury instruction concerning intimidation; 6) ineffective appellate counsel; and 7) six grounds for relief not provided for in the *Losh* list. After holding an omnibus evidentiary hearing, the circuit court denied petitioner post-conviction habeas relief. Petitioner now appeals to this Court.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

On appeal, petitioner re-asserts the same arguments that the circuit court rejected. First, petitioner re-asserts that his trial counsel was ineffective because: 1) this was trial counsel's first criminal jury trial; 2) trial counsel failed to file a pre-trial motion challenging the use of a photo line-up; 3) trial counsel failed to object to an "all white jury"; 4) trial counsel failed to object to testimony regarding the identification of petitioner and challenge the photo line-up; 5) trial counsel failed to present evidence concerning blood samples or shoe size from the scene of the crime; 6) trial counsel failed to object to Detective Sizemore's alleged expert testimony; 7) trial counsel failed to object to the circuit court's discussion regarding a question from a juror and its instruction concerning jury intimidation; 8) trial counsel failed to question the victim's husband regarding the inconsistent description of petitioner by the victim; and 9) trial counsel failed to present evidence challenging the victim's inconsistent descriptions of petitioner.

Upon our review and consideration of the circuit court's order, the parties' arguments, and record submitted on appeal, we find no error or abuse of discretion by the circuit court. Our review of the record supports the circuit court's decision to deny petitioner post-conviction habeas corpus relief based on the errors he assigns in this appeal, which were also argued below. Having reviewed the circuit court's "Order Denying and Dismissing Petition," entered February 3, 2014, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions of law as to those assignments of error raised in this appeal. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** February 9, 2015

**CONCURRED IN BY:**

Chief Justice Margaret L. Workman
Justice Robin Jean Davis
Justice Brent D. Benjamin
Justice Menis E. Ketchum
Justice Allen H. Loughry II

# IN THE CIRCUIT COURT OF FAYETTE COUNTY, WEST VIRGINIA

TONY J. WALTON,

Petitioner,

v.

Case No.: 12-C-330
Judge Paul M. Blake, Jr.

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

Respondent.

## ORDER
## DENYING AND DISMISSING PETITION

This matter is before the Court on a *Petition for Writ of Habeas Corpus Ad Subjiciendum* filed by *Petitioner*, Tony J. Walton, by and through counsel, Thomas W. Kupec, Esq., on October 29, 2012. The *Petitioner* filed a *Losh List* on June 5, 2013. At a hearing held on June 7, 2013, the *Petitioner* advised the Court that he was satisfied with his habeas counsel's representation and waived, on the record, all grounds not asserted in his *Losh List*. This Court conducted an omnibus evidentiary hearing on the asserted grounds on July 15, 2013. Following the hearing, both parties submitted proposed findings of fact and conclusions of law to the Court for its review.

The Court has carefully reviewed the relevant portions of the record, the filings in this matter, and the relevant legal authority and has carefully considered the parties' arguments and the evidence presented at the omnibus hearing. Based upon the following findings of fact and conclusions of law, the Court is of the opinion that the *Petition for Writ of Habeas Corpus Ad Subjiciendum* should be, and hereby is, **DENIED** and **DISMISSED**, with prejudice, and enters this *Comprehensive Dismissal Order* pursuant to Section 53-4A-7(c) of the *West Virginia Code*

-1-

and Rule 9(c) of the *West Virginia Rules Governing Post-Conviction Habeas Corpus Proceedings*.

## STATEMENT OF THE CASE

On December 24, 2008, at approximately 7:25 a.m., Lisa Castanon, a manager of a Family Dollar Store in Mount Hope, West Virginia, was surprised, shortly after unlocking the store, by a man wielding a pipe in his left hand. Mrs. Castanon was struck in the head with the pipe and pushed into an end cap of mirrors while struggling with the attacker over the two money bags she had in her hand. During the attack, she managed to spray the attacker with pepper spray causing the attacker to flee the store with only one bag of money.

Mrs. Castanon later described her attacker as a young, light skinned, black male approximately six feet one inch in height, wearing a hooded sweatshirt and dark jersey gloves. Shortly after the incident, a police officer showed Mrs. Castanon a photo lineup, comprised of six photographs, wherein she identified Tony J. Walton as the attacker. Later that same day, Mr. Walton was arrested and charged with first degree robbery and assault during the commission of a felony for the incident occurring at the Family Dollar Store.

Following a two (2) day jury trial, Tony J. Walton was convicted of robbery in the first degree and assault during the commission of a felony. He was subsequently sentenced to a determinate sentence of fifty (50) years in the West Virginia State Penitentiary for the offense of robbery in the first degree and an indeterminate sentence of not less than two (2) nor more than ten (10) years in the West Virginia Penitentiary for the offense of assault during the commission of a felony. The sentences were ordered to be served consecutively.

## PROCEDURAL HISTORY AND GENERAL FINDINGS OF FACT

1. On December 24, 2008, the Family Dollar Store at Mount Hope, WV was robbed by a black male wielding a pipe.

2. On December 24, 2008, the Petitioner, Tony J. Walton, was arrested and charged with robbery in the first degree and assault during the commission of a felony.

3. On January 13, 2009, a preliminary hearing was held before Fayette County Magistrate M. D. Parsons wherein probable cause was found and the matter was bound over for presentment to a Fayette County Grand Jury. The Petitioner, was represented by the Fayette County Public Defender's Office.

4. On May 12, 2009, a Fayette County Grand Jury returned an indictment against the Petitioner for the crimes of robbery in the first degree and assault during the commission of a felony.

5. On May 22, 2009, the Petitioner was arraigned, and by and through trial counsel, Assistant Public Defender, Elizabeth S. Kearney, Esq. (referred to hereinafter as "*Trial Counsel*"), entered a plea of not guilty to both counts of the indictment.

6. On July 24, 2009, Petitioner, through counsel, filed a *Motion To Continue* the August 11, 2009, trial to grant the Petitioner additional time to seek forensic testing of facial swabs taken the day of the crime.

7. On August 4, 2009, an agreed order was entered to provide the Petitioner with a transcript of the grand jury proceedings related to this matter.

8. By agreed order entered September 4, 2009, the Court continued the matter to the September term of court pending the results of trace evidence analysis.

9. On September 16, 2009, the Court scheduled the matter for a jury trial to begin on December 10, 2009, at 9:00 a.m.

10. A jury trial was conducted in the matter beginning on December 10, 2009, at 9:00 a.m., and concluding on December 11, 2009, at 3:04 p.m., with the jury returning a verdict of guilty to both robbery in the first degree and assault during the commission of a felony.

11. On December 17, 2009, Petitioner, by counsel, filed a *Motion For A New Trial*.

12. On December 18, 2009, Petitioner, by counsel, filed a *Motion For Judgment Of Acquittal*.

13. On January 26, 2010, a sentencing/motions hearing was held in the matter, wherein the Court took the following action:

   a. found that sufficient evidence existed to find the Petitioner guilty and thereby denied Petitioner's *Motion For Judgment Of Acquittal*;

   b. found that all twelve (12) jurors stated that they could render a fair verdict based solely on the evidence and that the Court steered a middle course by telling the jury to not base a verdict on the fear of reprisal and thereby denied Petitioner's *Motion For A New Trial*;

   c. denied the Petitioner's application for probation and/or alternative sentencing,

   d. sentenced the Petitioner to a determinate period of fifty (50) years in the West Virginia State Penitentiary for the felony offense of robbery in the first degree, as charged in Count One of Indictment No. 09-F-92;

   e. sentenced the Petitioner to an indeterminate period of not less than two (2) nor more than ten (10) years in the West Virginia State Penitentiary and assessed a fine in the amount of one thousand dollars ($1,000.00) for the felony offense of

-4-

assault during the commission of a felony, as charged in Count Two of Indictment No. 09-F-92;

    f.   ordered that the sentences be served consecutively;

    g.  advised the Petitioner of his right to appeal the Court's judgment to the Supreme Court of Appeals of West Virginia and gave him written notice of the same.

14. On February 2, 2010, the Petitioner, through counsel, completed a *WV Supreme Court of Appeals Appellate Transcript Request*.

15. On February 18, 2010, the Petitioner, through counsel, filed a *Notice Of Intent To Appeal*.

16. On March 26, 2010, the Petitioner filed a *Motion For Reconsideration Of Sentence*.

17. On March 30, 2010, the Court denied Petitioner's *Motion For Reconsideration Of Sentence*.

18. On April 9, 2010, the Petitioner, through counsel, filed a *Motion To Extend Time For Filing A Petition For Appeal*.

19. On April 13, 2010, the Court granted the Petitioner's *Motion To Extend Time For Filing A Petition For Appeal* and extended the time period by two (2) months.

20. On April 21, 2010, subsequent to the Petitioner filing a financial affidavit of eligibility for court appointed counsel, the Court appointed the Cabell County Public Defender's Office to prosecute the Petitioner's appeal.

21. On June 4, 2010, the Petitioner, by and through **appellate counsel, Gina Stanley, Esq.** (referred to hereinafter as "*Appellate Counsel*"), submitted a *Petition For Appeal* to the Supreme Court Of Appeals Of West Virginia wherein the Petitioner alleged it was error for this Court to instruct the jury on intimidation or retaliation against jurors or witnesses.

22. On June 14, 2010, the Supreme Court Of Appeals Of West Virginia acknowledged receipt of the Petitioner's *Petition For Appeal*, Supreme Court No. 100750.

23. On September 22, 2010, the Supreme Court Of Appeals Of West Virginia refused the Petitioner's *Petition For Appeal.*

24. On June 14, 2012, the Petitioner, by and through habeas counsel, Thomas W. Kupec, Esq. (referred to hereinafter as *"Habeas Counsel"*), submitted an original *Petition For Writ Of Habeas Corpus* to the Supreme Court Of Appeals Of West Virginia wherein the Petitioner alleged ineffective assistance of trial counsel as the sole ground for the writ of habeas corpus.

25. On September 24, 2012, the Supreme Court Of Appeals Of West Virginia refused the Petitioner's original habeas petition, without prejudice, to refile in circuit court to permit an evidentiary hearing on the allegation of ineffective assistance of counsel.

26. On October 29, 2012, the Petitioner, by and through counsel, Thomas W. Kupec, Esq., filed a *Petition for Writ of Habeas Corpus Ad Subjiciendum* in the Circuit Court of Fayette County, West Virginia.

27. On November 19, 2012, the Court entered an *Order To File An Answer*, wherein Petitioner's counsel was ordered to carefully review the comprehensive grounds contained in *Losh V. Mckenzie* with the Petitioner and file a *"Losh List"* with the Court at least two (2) weeks before the omnibus hearing.

28. On January 17, 2013, Respondent, David Ballard, Warden, Mount Olive Correctional Complex, by and through counsel, Brain D. Parsons, Esq., Assistant Prosecuting

-6-

Attorney for Fayette County, West Virginia, filed a *Response To Petition For Writ Of Habeas Corpus*.

29. On January 30, 2013, the Court entered an *Order Scheduling Hearing* wherein the matter was set for an omnibus evidentiary hearing to be held on May 1, 2013, at 10:00 a.m.

30. As of April 23, 2013, the Court had still not received the Petitioner's *Losh List*.

31. The Court rescheduled the matter for June 7, 2013, to allow the Petitioner additional time to submit the required *Losh List*.

32. On June 5, 2013, the Petitioner filed a *Losh List* wherein the Petitioner asserted the following six (6) grounds for relief:

> 1) Ineffective assistance of trial counsel;
>
> 2) Denial of defendant's constitutional right to a trial of his peers;
>
> 3) Violation of defendant's constitutional rights when the State used the "photo line-up" to identify the Defendant;
>
> 4) Denial of the defendant's constitutional right to a fair and impartial jury;
>
> 5) Improper jury instruction concerning intimidation; and
>
> 6) Ineffective assistance of appellate counsel.

33. On June 7, 2013, at a hearing conducted in the matter, the Petitioner acknowledged on the record that the *Losh List* provided, and the grounds asserted therein, were the only grounds being pursued for this habeas proceeding. At the conclusion of the hearing, the Court scheduled an omnibus evidentiary hearing to be conducted on July 15, 2013.

34. On July 15, 2013, the matter came on before this Court for an omnibus evidentiary hearing wherein the following witnesses testified:

a. Elizabeth Kearney Campbell (*Trial Counsel*);

b. Cathy Jarrett (Deputy Circuit Clerk for Fayette County); and

c. Tony Walton (Petitioner).

35. At the conclusion of the omnibus hearing, upon the motion of Habeas Counsel, the Court took judicial notice of all past proceedings and the record in the matter.

36. Also at the conclusion of the omnibus hearing, the Court ordered counsel for both parties to submit proposed findings of fact and conclusions of law.

37. On August 13, 2013, the Respondent filed proposed findings of fact and conclusions of law.

38. On October 21, 2013, the Petitioner filed proposed findings of fact and conclusions of law.

## ULTIMATE FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. The right to petition the Court for a post-conviction writ of habeas corpus is guaranteed by the West Virginia Constitution, Article III, Section Four. Post conviction habeas corpus proceedings are governed by the *West Virginia Rules Governing Post Conviction Habeas Corpus Proceedings in West Virginia*, (referred to hereinafter as "Rule" or "Rules"), and West Virginia Code §53-4A-1, *et seq*. Pursuant thereto, this Court FINDS that it has jurisdiction over the subject matter of this proceeding.

2. West Virginia Code §53-4A-1(a) provides that a person convicted of a crime and incarcerated under a sentence of imprisonment may file a petition for writ of habeas corpus ad subjiciendum asserting certain grounds and seeking release:

> . . . if and only if such contention or contention and the grounds in fact or law relied upon in support thereof have not been previously and finally adjudicated or waived in the proceeding which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the

-8-

provisions of this article, or in any other proceeding or proceedings which the petitioner has instituted to secure relief from such conviction or sentence : ...

West Virginia Code §53-4A-1(a).

3. West Virginia Code §53-4A-1(b) further provides that:

> ... [A] contention or contentions and the grounds in fact or law relied upon in support thereof shall be deemed to have been previously and finally adjudicated only when at some point in the proceedings which resulted in the conviction and sentence, or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, there was a decision on the merits thereof after a full and fair hearing thereon and the time for the taking of an appeal with respect to such decision has not expired or has expired, as the case may be, or the right of appeal with respect to such decision has been exhausted, unless said decision upon the merits is clearly wrong.

West Virginia Code §53-4A-1(b).

4. West Virginia Code §53-4A-1(c) also provides:

> ... [A] contention or contentions and the grounds in fact or law relied upon in support thereof shall be deemed to have been waived when the petitioner could have advanced, but intelligently and knowingly failed to advance, such contention or contentions and grounds before trial, at trial, or on direct appeal (whether or not said petitioner actually took an appeal), or in a proceeding or proceedings on a prior petition or petitions filed under the provisions of this article, or in any other proceeding or proceedings instituted by the petitioner to secure relief from his conviction or sentence, unless such contention or contentions and grounds are such that, under the Constitution of the United States or the constitution of this state, they cannot be waived. ...

West Virginia Code §53-4A-1(c).

5. In general, the post-conviction habeas corpus statute, W.Va.Code, 53-4A-1 et seq. (1967) contemplates that every person convicted of a crime shall have a fair trial in the circuit court, an opportunity to apply for an appeal, and one omnibus post-conviction habeas corpus hearing at which he may raise any collateral issues which have not previously been fully and fairly litigated. Losh v. McKenzie, 166 W. Va. 762, 764, 277 S.E.2d 606, 609 (1981).

-9-

6. A person convicted of a crime is ordinarily entitled to only one post-conviction habeas corpus proceeding. *See* Syllabus Pt. 1, in part, Gibson v. Dale, 173 W.Va. 681, 319 S.E.2d 806 (1984); Syl. Pt. 1, Markley v. Coleman, 215 W.Va. 729, 731, 601 S.E.2d 49, 51 (2004), *per curiam*, **emphasis added**.

7. The Petitioner is currently incarcerated in Mount Olive Correctional Center on sentences imposed by this Court as a result of a Fayette County Petit Jury convicting him of one count of robbery in the first degree and one count of assault during the commission of a felony. The contentions alleged in Petitioner's petition for writ of habeas corpus have not been waived or previously and finally adjudicated in any other proceeding. The Court **FINDS** that the contentions alleged by Petitioner, and the relief sought, are properly raised in the Petitioner's *Petition for Writ of Habeas Corpus Ad Subjiciendum*.

8. At the omnibus habeas corpus hearing, a petitioner is required to raise all grounds known or that reasonably could be known by the petitioner. Markley v. Coleman, 215 W. Va. 729, 732-33, 601 S.E.2d 49, 52-53 (2004). At a hearing conducted by this Court on June 7, 2013, the Petitioner specifically informed the Court that the six (6) grounds alleged in Petitioner's *Losh List* were the only grounds being asserted in the habeas proceeding. The Petitioner was further informed that any grounds not asserted were waived. The Petitioner advised the Court that he was satisfied with his habeas counsel, Thomas W. Kupec, Esq., and that he knowingly understood that he was waiving all other grounds except for 1) Ineffective assistance of trial counsel; 2) Denial of defendant's constitutional right to a trial of his peers; 3) Violation of defendant's constitutional rights when the State used the "photo line-up" to identify the Defendant; 4) Denial of the

-10-

defendant's constitutional right to a fair and impartial jury; 5) Improper jury instruction concerning intimidation; and 6) Ineffective assistance of appellate counsel. The Court FINDS and CONCLUDES that the Petitioner, with the assistance of habeas counsel with whom he was well satisfied, knowingly waived all contentions and grounds that were not asserted at the omnibus habeas corpus hearing held on July 15, 2013.

9. "[A] [c]ircuit court denying or granting relief in [a] habeas corpus proceeding is statutorily required to make specific findings of fact and conclusions of law relating to each contention advanced by petitioner, and to state [the] grounds upon which [the] matter was determined." Syllabus Point 4, Markley v. Coleman, 215 W. Va. 729, 731, 601 S.E.2d 49, 51 (2004); *See* Syllabus Pt. 1, State ex rel. Watson v. Hill, 200 W.Va. 201, 488 S.E.2d 476 (1997); *See also* Syl. Pt. 8, State ex rel. Vernatter v. Warden, West Virginia Penitentiary, 207 W.Va. 11, 14, 528 S.E.2d 207, 210 (1999).

## ANALYSIS OF EACH GROUND ASSERTED BY PETITIONER

**GROUND 1) Ineffective Assistance of Trial Counsel**

Petitioner asserts ineffective assistance of trial counsel as his first and major ground for relief. The Petitioner alleges that his *Trial Counsel* provided him with ineffective assistance because of the following:

1. This was *Trial Counsel's* first criminal jury trial and she had no prior experience in defending against the charges of robbery and assault in commission of a felony (*Losh List*, p. 1, subsec. a));

2. *Trial Counsel* failed to file a motion for a pre-trial hearing on the Petitioner's out of court identification, including the use of the photo line-up (*Losh List*, p.1, subsec. b));

-11-

3. *Trial Counsel* failed to object during jury selection and voir dire when no jurors were empanelled of ethnicity/race other than "white" jurors (*Losh List*, p.1, subsec. c));

4. *Trial Counsel* let stand the testimony of identification of the Petitioner and did not challenge the photo line-up (*Losh List*, p.1, subsec. d));

5. *Trial Counsel* failed to put on evidence concerning blood samples and foot or shoe size from the scene, which could have been presented in the defense of the Petitioner (*Losh List*, p.2, subsec. e));

6. *Trial Counsel* let stand the testimony of the State Witness, Det. Sizemore, without any objections, as to his "expert" testimony concerning the mace components (*Losh List*, p.2, subsec. f));

7. *Trial Counsel* failed to properly react to the Judge's action upon the question by a jury member and to the Court's reprimanding of individuals in the courtroom who were perceived to be "friends" of the Defendant (*Losh List*, p.2, subsec. g));

8. *Trial Counsel* left the State's witness, Tony Castanon, unquestioned on his confusing identifications of the attacker's description, his wife, Lisa Castanon, gave him (*Losh List*, p.2, subsec. h)); and

9. *Trial Counsel* failed to put on any evidence to show the various descriptions given by the victim, in her description of her attacker to the 911 operator and in her written statement given to the police (*Losh List*, p.2, subsec. i)).

The West Virginia Supreme Court has stated, "[o]ur law is clear in recognizing that the Sixth Amendment of the federal constitution and Article III, § 14 of the state constitution guarantee not only the assistance of counsel in a criminal proceeding but that a defendant has the

-12-

right to effective assistance of counsel." Ballard v. Ferguson, 12-1028, 2013 WL 5814130 (W. Va. Oct. 25, 2013) (citing Cole v. White, 180 W. Va. 393, 395, 376 S.E.2d 599, 601 (1988).

"In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*: (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, State v. Miller, 194 W. Va. 3, 6, 459 S.E.2d 114, 117 (1995) (citation omitted). "In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Syl. Pt. 6, id. at 6-7, 459 S.E.2d at 117-118.

The objective standard to be applied to ineffective assistance of counsel claims was further explained by the *Miller* Court when it stated,

> [i]n other words, we always should presume strongly that counsel's performance was reasonable and adequate. A defendant seeking to rebut this strong presumption of effectiveness bears a difficult burden because constitutionally acceptable performance is not defined narrowly and encompasses a "wide range." The test of ineffectiveness has little or nothing to do with what the *best* lawyers would have done. Nor is the test even what most *good* lawyers would have done. We only ask whether a *reasonable* lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at the time, in fact, worked adequately.

Id. at 16, 459 S.E. 2d at 127 (emphasis added).

The Court has thoroughly reviewed the record, arguments of counsel, and hearing transcripts related to all of the contentions listed under the Petitioner's ineffective assistance of counsel claim. *See supra* subsec. a-i pp.12-13. Pursuant to the guidance offered in *Legursky*, this Court will not address both prongs of the test, but will only analyze under the prong that the assertion fails to meet. State ex rel. Daniel v. Legursky, 195 W. Va. 314, 321, 465 S.E.2d 416, 423 (1995) (stating a court "need not address both prongs . . . but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.") However, this Court may address both prongs, or offer additional analysis, if it deems that such extensive analysis would be helpful in fully addressing Petitioner's contention.

1. **First criminal jury trial and no prior experience in defending against the charges of robbery and assault in commission of a felony**

Petitioner contends that *Trial Counsel's* assistance was ineffective because this was her first criminal jury trial and she had no prior experience defending against the charges of robbery and assault during the commission of a felony.

The Supreme Court has previously stated,

> [t]he fulcrum for any ineffective assistance of counsel claim is the adequacy of counsel's investigation. Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, counsel must at a minimum conduct a reasonable investigation enabling him or her to make informed decisions about how best to represent criminal clients.

Legursky, at 317, 465 S.E.2d at 419.

-14-

Whether this was *Trial Counsel's* first criminal jury trial, or whether *Trial Counsel* had ever represented another defendant charged with these same crimes, has little bearing on a showing of ineffective assistance of counsel. To hold that an attorney's first trial was in and of itself a basis for ineffective assistance of counsel claims, would open the "floodgates" to post trial proceedings. This Court has difficulty imagining the repercussions of just such a holding. First, this would chill any attorney from stepping into the courtroom, because every counsel has to have their *first* trial. Secondly, the standard is not based upon experience, or what the best attorney, or even a good attorney, would have done. *See* State v. Miller, 194 W. Va. 3, 16, 459 S.E.2d 114, 127 (1995). The standard is "whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Id.

Petitioner's contention attempts a parallel comparison between counsel's competency and counsel's experience. This, however, ignores the facts adduced at the omnibus habeas corpus hearing (referred to hereinafter as "OHCH"). This was *Trial Counsel's* first jury trial as the lead attorney, however, this was not her first experience with a jury trial. *Trial Counsel* began at the public defender's office almost two years prior to the Petitioner's trial and during that time she "had sat second chair in a number of other jury trials." *See* OHCH transcript, p. 8.

During the course of *Trial Counsel's* representation of the Petitioner, which began at his preliminary hearing on charges in Magistrate Court, she performed several actions to bring herself up to speed and prepare her to argue Petitioner's case. *See* OHCH transcript, p. 10 (presenting Petitioner's case at the preliminary hearing); *Id.* at 10-11 (conducting extensive investigation in support of Petitioner's alibi defense); *Id.* at 11 (securing a private investigator for further investigation of Petitioner's case); *Id.* at 11, 30 (conferring with seasoned counsel on

-15-

various issues in the case including the admissibility and makeup of the photo line-up); *Id.* at 10-12, 64, 109-119 (meeting and discussing case with Petitioner); *Id.* at 11-12 (securing an expert forensic analyst). *Trial Counsel's* conduct in preparation for this case allays any fears this Court may have concerning the adequacy of counsel's investigation.

The Court **FINDS** that *Trial Counsel* spent a significant amount of time conducting a reasonable and adequate investigation of Petitioner's case and the mere fact that Petitioner's jury trial was *Trial Counsel's* first jury trial, as lead counsel, does not support a finding of ineffective assistance of counsel. This Court further **FINDS** and **CONCLUDES** that Petitioner's first contention is without merit and fails to establish that *Trial Counsel's* performance was deficient under an objective standard of reasonableness.

2. **Failure to file a motion for a pre-trial hearing on the Petitioner's out of court identification, including the use of the photo line up**

Petitioner contends that *Trial Counsel* was ineffective because she did not file a motion for a pre-trial hearing on the use of the photo line-up, or other means, of out of court identification of the Petitioner.

Attorneys have an ethical duty to zealously and adequately represent a criminal defendant's interests. *See* Model Code of Professional Responsibility Canon 7 (1981); *See also* Bruce A. Green, Zealous Representation Bound: The Intersection of the Ethical Codes and the Criminal Law, 69 N.C. L. Rev. 687 (1991). That obligation, however, is not without bounds. *See* WV R RPC Rule 3.1 (establishing the basis upon which a lawyer may raise issues or defend proceedings and extending the rule to permit criminal defense counsel the discretion to require proof of each element).

-16-

This obligation and limitation is comparable to the analysis required when addressing ineffective assistance of counsel claims. *See* Syl. Pt. 6, <u>Miller</u>, at 6- 7, 459 S.E.2d at 117-118 (requiring courts to analyze counsel's performance under an objective standard of reasonableness, while limiting this analysis to avoid hindsight or second-guessing of trial counsel's strategic decisions). Further, this review of counsel's trial decisions and performance hinges on the adequacy of counsel's investigation. Legursky, at 317, 465 S.E.2d at 419.

In the case at bar, *Trial Counsel* did not haphazardly determine that the interests of the defendant were better served by expending her time and resources in areas other than challenging the constitutionality and admissibility of the out of court identification and photo line-up. *Trial Counsel* thoroughly reviewed the photo line-up, and the circumstances surrounding the identification, and then conferred with veteran defense attorneys on the issue of the constitutionality of the line up and out of court identification. *See* OHCH transcript, pp. 16-17, 30-32. She also conferred with the Petitioner about issues involving the out of court identification. *Id.* at 16. Then based upon all of this information, she made a reasonable decision not to file any pre-trial motions on the out of court identification or the use of the photo line-up because she felt it would be somewhat frivolous and a waste of resources. *Id.* at 16-17.

Simply put, public defenders, like the justice system as a whole, are burdened by a high case load and limited resources. A public defender's concentration of effort and resources on the most viable defenses is tantamount to the effective representation of a criminal defendant. When *Trial Counsel* conducts a reasonable investigation of the underlying facts, this Court will not second guess *Trial Counsel's* allotment of effort or resources, nor will it question *Trial*

-17-

*Counsel's* decision not to file a pre-trial motion on issues they deem to be frivolous or unfounded.

Based upon the foregoing, the Court **FINDS** that *Trial Counsel* made a reasonable decision not to file a pre-trial motion on both the out of court identification and the photo line-up. The Court further **FINDS** and **CONCLUDES** that Petitioner's second contention that *Trial Counsel* was ineffective because she failed to file pre-trial motions on the out of court identification and photo line-up is without merit and fails to establish that *Trial Counsel's* performance was deficient under an objective standard of reasonableness.

Even assuming arguendo that Petitioner's second contention meets the first prong of *Strickland*, it is important to note that based upon a review of the record, testimony, and relevant case law, the Court also **FINDS** that the photo line-up and out of court identification were constitutionally sound. *See infra* discussion and findings pp. 26-39, 62. The Court further **FINDS** and **CONCLUDES** that Petitioner's second contention also fails to meet the prejudice prong of *Strickland* because Petitioner has failed to show that he was prejudiced by *Trial Counsel* not filing pre-trial motions on the out of court identification and photo line-up.

3. **Failure to object during jury selection and voir dire when no jurors were empanelled of ethnicity/race other than "white" jurors**

Petitioner contends that *Trial Counsel* was ineffective because she failed to object during jury selection and voir dire when no jurors were empanelled of ethnicity/race other than "white" jurors.

The Petitioner's contention assumes that the jury empanelment procedure operated to exclude all other races, more specifically African Americans, from serving on his jury, and that under that assumption, *Trial Counsel* had an obligation to assert that the empaneled jury did not

-18-

represent a fair cross section of the community. Petitioner's argument can be broken down into even simpler terms; the Petitioner is African American and he felt that his jury should have been made up of at least some people of like ethnicity.

This Court seeks guidance from the *Hobbs* case. State v. Hobbs, 168 W. Va. 13, 282 S.E.2d 258 (1981). In that case, the Supreme Court clarified the test to be applied when analyzing unconstitutional jury selection methods under the Sixth Amendment's fair cross-section requirement. Syl. Pt. 2, Id. at 13-14, 282 S.E.2d at 260. A succinct restatement of the test was drawn from the United States Supreme Court case of *Duren v. Missouri*:

> (T)he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Hobbs, at 25, 282 S.E.2d at 266 (*citing* Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586-587 (1979)).

The Court further directed that "[t]he question of constitutionally impermissible exclusion must be examined on a case-by-case basis considering the particular selection method chosen and the size and characteristics of the excluded group and of the local population." Id. at 30-31, 282 S.E.2d at 269.

Applying the *Duren* test to the case at bar, this Court acknowledges that prong one is met because African Americans are a "distinctive" group in the community. However, beyond the cognitive group prong, Petitioner's assertions are left wanting.

-19-

"The primary goal of the jury selection process is to obtain a jury that will fairly and impartially decide the case at hand." Davis v. McBride, 221 W. Va. 240, 245, 654 S.E.2d 364, 369 (2007) (citing, in part, Syl. pt. 1, State v. Hatfield, 48 W.Va. 561, 37 S.E. 626 (1900)). A jury comprised of a fair-cross-section of the community is fundamental to the jury trial guarantees contained in the Sixth Amendment. See Hobbs, 168 W. Va. at 23-24, 282 S.E.2d at 265. Without a properly comprised jury, there is nothing "to guard against the exercise of arbitrary power" or guarantee "the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." Id.

The composition of the jury pool is not required to mirror the community as a whole. Id. at 24-25, 282 S.E.2d at 266. As the Supreme Court stated in its clarification of the fair cross-section doctrine:

> It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

Id. (citing Taylor v. Louisiana, 419 U.S. at 538, 95 S.Ct. at 702, 42 L.Ed.2d at 703-704).

The *Hobbs* case further stressed the importance of a constitutionally sound jury selection process:

> [t]his prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public

confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. "Trial by jury presupposes a jury drawn from a pool broadly representative of the community as well as impartial in a specific case .... (T)he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility."

Id. at 24, 282 S.E.2d at 265-66 (citing Taylor v. Louisiana, 419 U.S. at 530-531, 95 S.Ct. at 697-698, 42 L.Ed.2d at 698).

At the omnibus habeas hearing, Petitioner called Cathy Jarrett, Chief Deputy Clerk of Fayette County, to the stand. See OHCH transcript, p. 71. Ms. Jarrett testified concerning the procedure used to empanel juries in Fayette County. Id. at 72-78. In January of each year, Software Systems computer system in Morgantown, West Virginia, randomly compiles a large list of names from information received from the driver's license division of the Department of Motor Vehicles and Voter's Registration. Id. at 72-73. This service is authorized by the West Virginia Supreme Court. Id. at 75. Every term of court, two panels are developed by a computer randomly compiling two hundred names, for each of the panels, from the larger list. Id. at 72, 75-76. Questionnaires are then sent out to all of the members of each panel. Id. at 75. After disqualifications for qualifying reasons, of those two hundred original names, an average of approximately sixty names remain. Id. The first panel of sixty people is required to serve for half of a term before the second panel of sixty people is called in to serve the second half of the term. Id. at 77. When a jury is required, the sixty people's names are placed into a box, which is then shook up, and the names for jury service are then randomly picked from the box. Id. at 78. Upon

-21-

being released from service, the sixty people are then excluded from service for a period of two years. *Id.* at 77.

On cross examination, Ms. Jarrett further testified as follows:

Q:    Ms. Jarrett, to your knowledge and information, is there any policy that the circuit clerk's office has or the circuit court has for purposely excluding certain races from serving on a jury?
A:    No, sir.

*Id.* at 78.

Under the facts of this case, Petitioner was provided a jury that was randomly selected from two different broad sources. Nothing in the manner, or method, of comprising the jury, worked to exclude any cognitive group.

Further, Petitioner did not put forth any evidence to show that members of the African American race, or any other cognitive group, are underrepresented in a jury pool drawn from voter's registration rolls and licensed drivers in Fayette County. No statistics were provided to show how many African Americans actually reside in Fayette County. No statistical data was provided to show how many African Americans are licensed to drive, or registered to vote, in Fayette County. There was simply no evidence put forth that shows a "disproportionate exclusion of a distinctive group." Duren v. Missouri, 439 U.S. at 367, 368, 99 S.Ct. at 670, 58 L.Ed.2d at 589 (1979).

This Court is confident that even detailed statistical data would offer little support for Petitioner's argument. As such, the Petitioner fails to show that the act of randomly selecting venire names from licensed drivers and registered voters, caused African Americans, or any other race, to be unfairly and unreasonably underrepresented in the Petitioner's jury pool.

-22-

Although the Petitioner's argument fails to establish the second prong of *Duren*, it is important to note that even assuming arguendo that Petitioner had met his burden under the representative comparison prong, Petitioner's argument still fails under the systematic exclusion prong of the test.

The method used to select the Petitioner's jury pool, and jury, was completely random. This randomness acted as a barrier to exclude even the possibility of systematic discrimination rearing its ugly head. Although there were no African American jurors on Petitioner's jury, this does not mean that Petitioner's jury was not a fair cross section of the community consistent with the requirement of the Sixth Amendment to the United States Constitution. The Petitioner is not guaranteed a jury of his choosing. *See* Hobbs, at 24-25, 282 S.E.2d at 266. He is, however, constitutionally guaranteed a jury of his peers comprised of a representative cross-section of the community. *See* USCA CONST Amend. VI; *See also* W. Va. Const. art. III, § 10.

African American residents of Fayette County are licensed to operate motor vehicles and are registered to vote. A random selection process was utilized to comprise Petitioner's jury panel from these two sources, thereby guaranteeing that Petitioner's venire comported with the constitutional requirements of both, the United States, and the West Virginia, Constitution.

Based upon all of the foregoing, this Court FINDS that Petitioner has failed, under a *Duren* analysis, to make a prima facie showing that the random use of licensed drivers and registered voters of the county resulted in a jury pool that did not represent a fair cross-section of the community. This Court further FINDS that Petitioner was provided a jury of his peers properly comprised of a fair cross-section of the community consistent with federal and state constitutional requirements.

-23-

Having found that the Petitioner's constitutional right to a jury of his peers was not violated, when no jurors were empanelled of African American, or other ethnicity, this Court will now address Petitioner's ineffective assistance of counsel contention.

At the omnibus hearing, *Trial Counsel* testified as follows:

Q:     How many black people were on the jury panel in that trial? Do you know?
A:     I don't recall now. I don't recall if there were any.
Q:     Did you raise that issue up, that - - whether or not Mr. Walton was entitled to have black people - - representatives on the jury panel?
A:     No. No, I did not raise that. That's common, as well, on our juries. That does happen. But, no, I did not raise that.
Q:     Do you know what percentage of black people there are in Fayette County?
A:     No, sir, I don't.

OHCH transcript, pp. 39-40.

Petitioner elicited no further testimony or evidence related to *Trial Counsel's* failure to object during jury selection, or voir dire, to the racial composition of the jury.

Petitioner alleges that *Trial Counsel* was deficient for not taking action by objecting to the racial composition of the jury, however, he does not show any basis that would require his counsel to take action.

"[A] [mere] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim." <u>State ex rel. Hatcher v. McBride</u>, 221 W. Va. 760, 766, 656 S.E.2d 789, 795 (2007) (*quoting* <u>State Dept. Of Health v. Robert Morris N.</u>, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995) (language added). Further, a jury made up of citizens who are not of a race comparable to that of the accused, is not in and of itself objectionable nor, per se, improper. *See* <u>Hobbs</u> at 24-

-24-

25, 282 S.E.2d at 266 (*citing* <u>Taylor v. Louisiana</u>, 419 U.S. at 538, 95 S.Ct. at 702, 42 L.Ed.2d at 703-704.

Subjecting Petitioner's contention to the objectively reasonable standard of *Strickland*, *Trial Counsel*, being familiar with the makeup of Fayette County juries, could have readily recognized that no constitutional impediment existed. This Court cannot say that no "reasonable lawyer would have acted, under the circumstances, as defense counsel acted" in Petitioner's case. <u>Miller</u>, 194 W. Va. at 16, 459 S.E.2d at 127. Further, this Court fails to see how it could determine that *Trial Counsel* was not objectively reasonable in not objecting to what this Court has found to be a constitutionally sound jury venire and jury selection process. *See supra* discussion and findings pp. 18-24.

Based upon all of the foregoing, this Court **FINDS** and **CONCLUDES** the following:

1. The jury venire, and jury selection process, comported with the constitutional requirements of the United States, and the West Virginia, Constitution;

2. The Petitioner was afforded his constitutional right to a jury of his peers; and

3. Petitioner's third contention is without merit and fails to establish that *Trial Counsel's* performance in not objecting to the racial composition of the jury was deficient under an objective standard of reasonableness.

4. **Allowing the testimony of identification of the Petitioner to stand and not challenging the photo line-up.**

Petitioner contends that *Trial Counsel* was ineffective because she allowed the testimony related to the identification of the Petitioner to stand and did not challenge the photo line-up.

Use of a photo line-up for an out of court identification is governed by West Virginia Code § 62-1E-2. A photo line-up should consist of at least five photographs, which closely resemble the suspect description, but do not individually have any characteristics or background contexts that cause them to unduly stand out. W. Va. Code, § 62-1E-2(f), (g).

"Most courts have concluded that a photographic array will not be deemed excessively suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features. The fact that some of the photographs are dissimilar to the defendant's appearance will not taint the entire array." State v. Boykins, 173 W. Va. 761, 763, 320 S.E.2d 134, 135 (1984) (citing Syl. Pt. 6, State v. Harless, W.Va., 285 S.E.2d 461 (1981).

The photo line-up used in Petitioner's case consisted of six black males, light to medium in complexion, wearing a variety of clothing. See States Exhibit 21. Two of the photographs are of males who have a shaved head, while the other four photographs, including that of the Petitioner, depict males with short hair. Id. None of the photographs depict someone with a "corn row" hairstyle. Id. None of the photographs depict anyone wearing clothing resembling the description previously given by the victim. Id. All of the photographs represent males of a similar build. Id. Additionally, the photographs are cropped in a manner that even prevents a height distinction, aside from two photographs that depict a height scale in the background. See Id., #6 (showing the subject is approximately 6' 1" tall, similar to the victim's prior description); See also Id., # 2 (showing an unintelligible height scale in the background).

The six photographs that make up the Petitioner's photo line-up are very similar in appearance and are fairly representative of the Petitioner's physical features. As such, the photo

-26-

line-up was not suggestive and was created consistent with the suggestions outlined in W. Va. Code, § 62-1E-2.

Having determined that the photo line-up is not suggestive, and thereby constitutionally sound, this Court will now address the issue of the identification of the Petitioner.

At the trial in this matter, State's witness, Mount Hope Chief of Police, Howard Mitchell Canterbury, testified as follows:

Q:     And as a part of your investigation, did you speak to her in an effort to ascertain the identity or physical characteristics of the assailant?
A:     Yes, I did.
Q:     And what did she tell you?
A:     She described -- of course, the first thing I talked to her about was her physical condition and if she needed to go to the hospital. She didn't want to. I think eventually she did, but she didn't want to at the time.
       The second thing being my -- as a police officer, I'm looking at who could have committed this crime. We're pretty close in time here. We may be able to locate this person.
       So I asked her to describe this person to me. She described this person as a black male; a description of the clothing -- the hoodie, jersey gloves -- the complexion. She gave me a description that he was 6' 1", 170 pounds, light-complected.

Trial transcript, Volume I, p. 92.

This same witness further testified:

Q:     Now, as part of trying to solve this crime and to find the person responsible, did your department prepare and show Ms. Castanon what we would call a "photo line-up"?
A:     Yes, we did.
Q:     And when was that done?
A:     That was done on the same morning, that morning.
Q:     Within hours?
A:     Yes, sir.
Q:     And where was this line-up shown to her?
A:     At the Family Dollar Store.
Q:     And you were present?

-27-

A: I was not.

Q: You were present when the line-up was being put together; is that correct?

A: I was. At my office, yes.

Q: And I'm going to show you what's been marked as Exhibit 21 and ask if you recognize it (handing witness document).

A: Yes, sir, I do. This is the line-up that was prepared on the morning of this crime, on the 24th of December of '08.

Q: And are you aware of whether or not there's a photo of the defendant in that line-up?

A: Yes, there is.

Q: And are you aware of whether or not Ms. Castanon picked the photograph that is the defendant's photograph out of that line-up?

A: Again, not being there, -- I wasn't there when she picked it out, but I do know Officer Shropshire came back to my office to tell me that absolutely she had picked out Tony's picture from this line-up.

Q: The defendant.

A: The defendant, yes, sir.

Q: And that was within hours of the crime.

A: Very shortly after the crime, yes, sir.

Q: And that's the same photo line-up that was used on December 24th, that Ms. Castanon used to identify the defendant; is that correct?

A: That is the same.

*Id.* at 94-96.

The State then moved to admit the photo line-up into evidence. *Trial Counsel* did not object to its admission.

The foundation for the admission of the photo line-up, and the identification of the Petitioner through the testimony of Chief Canterbury, rather than the officer who conducted the actual identification with the photo line-up, Officer Shropshire, was clearly objectionable as it was partially based upon hearsay. *Trial Counsel*, at this point, could have objected to both the hearsay testimony of Chief Canterbury, and the State's foundation for entry of the photo line-up into evidence.

-28-

In evaluating whether *Trial Counsel's* conduct was professionally acceptable in Petitioner's case, this Court will avoid the use of hindsight to elevate a possible mistake into a deficiency of constitutional proportion. *See* Syl. Pt. 4, Legursky, at 317, 465 S.E.2d at 419. However, even avoiding the use of hindsight, this Court is of the opinion that *Trial Counsel* should have challenged the admission of the photo line-up and the out of court identification when both were based upon the hearsay testimony of Chief Canterbury.

*Trial Counsel's* performance in failing to object to the admission of the photo line-up and the out of court identification of Petitioner, was deficient under an objective standard of reasonableness and thereby meets the first prong of the *Strickland* test.

This Court must now apply the second prong of *Strickland* and determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. Pt. 5, Miller at 6, 459 S.E.2d at 117.

The State could have called Officer Shropshire to testify as to the victim's identification of the Petitioner and to lay the foundation for the admission of the photo line-up, as he was present and available to testify at the trial. *See* Trial transcript, Volume I, pp. 196-197. That was apparently unnecessary once the photo line-up and identification were permitted under the testimony of Chief Canterbury.

Also, the victim, Lisa Castanon, testified about her ability to identify the Petitioner, the identification, and the use of the photo line-up as follows:

Q:    Now you testified that he was two to three feet from you; is that correct?
A:    Yes, sir.
Q:    And did you get a good look at him?
A:    Yes, sir.

-29-

Q: How long was it until you had an opportunity to tell the police what he looked at?

A: It wasn't very long at all. I was on the parking lot. I mean, they were -- my husband was there, and then the police were there, and I think I told 911 what they were looking like -- what he looked like, and they were on the phone with me for a while.

Q. Let me ask you ma'am, was his head covered or not?

A. Yes. A hoodie.

Q. A hoodie covered his head.

A. Yes.

Q. Did he have a mask on?

A. No.

Q. Could you see his face clearly?

A. Yes.

Trial transcript, Volume I, pp. 170-171.

She further testified as follows:

Q: So you told the police what this guy looked like and what he did to you; is that correct?

A: Yes.

Q: And did they show you a line-up that had pictures in it?

A: Yes.

Q: And I'm going to hand you what's been admitted into evidence as Exhibit 21. If you would, take that, please.

A: (Witness complies.)

Q: What is Exhibit 21?

A: It's a line-up.

Q: Is that the same line-up they showed you on the 24th of December of last year?

A: Yes, sir.

Q: And do you see the man that you pointed out in that photo line-up in one of those photographs?

A: Yes, sir.

Q: Which one was it?

A: Top middle.

Q: Point it to the jury, please.

A: This one (indicating).

-30-

Q: Thank you, ma'am. Hand that back to the clerk, please.
A: (Witness complies.)

*Id.* at 171-172.

Lastly, during the following questioning, she identifies the Petitioner:

Q. And, ma'am, do you see the person in this -- do you see the person in this room who attacked you on December 24th of last year?
A. Yes.
Q. Would you point him out, please, and describe what he's wearing?
A. (Indicating) a black suit, glasses.
THE COURT: All right. The record will reflect that the witness has identified the defendant, Tony J. Walton.

*Id.* at 176.

The *Boyd* case offers significant guidance in the matter at hand. State v. Boyd, 167 W. Va. 385, 280 S.E.2d 669 (1981). In that case, the defendant argued that the out of court identification testimony of two state troopers was hearsay and should have therefore been excluded. Id. at 397, 280 S.E.2d at 679.

The *Boyd* Court addressed the purpose of the hearsay rule saying, "[t]he underlying rationale of the hearsay rule is to prevent the admission into evidence of unreliable or untrustworthy evidence." Id. The *Boyd* Court went on to state,

> "[a]ccordingly, when the identifying witness testifies at trial concerning a pre-trial identification, we believe the better view is to treat third party testimony regarding the identification as original evidence corroborative of the identifier's testimony. The third-party testimony is not hearsay under these circumstances because it is not offered to prove the truth of the matter asserted, but rather is offered as circumstantial evidence supporting an inference that the identifier's testimony is credible."

Id. at 398, 280 S.E.2d at 679.

The *Boyd* Court went on to hold that the lower court was proper in overruling the defendant's hearsay objection to the admission of the third party pre-trial identification. Id.

Although *Trial Counsel's* performance may have fallen below the mark when she failed to object to the obvious hearsay testimony which formed the basis for the admission of the photo line-up and the out of court identification of the Petitioner, this Court fails to see how but for this error, there was a reasonable probability that Petitioner would have been acquitted. *See generally* Syl. Pt. 5, Miller at 6, 459 S.E.2d at 117.

In the Petitioner's case, the victim thoroughly testified after Chief Canterbury, during direct and cross examination, about the pre-trial identification and the use of the photo line-up. *See supra* transcript text pp. 30-31. Chief Canterbury's hearsay testimony didn't provide any additional information beyond that which was provided by the victim. *See supra* transcript text pp. 27-28. Further, once the victim testified, Officer Shropshire's testimony was unnecessary, as it would have only provided circumstantial evidence to support the victim's testimony. *See* Boyd, at 398, 280 S.E.2d at 679.

The Petitioner places significant emphasis on both, the out of court identification, and the use of the photo line-up. He seems to suggest that the photo line-up was improperly suggestive and that if *Trial Counsel* had been proficient, she would have prevented the out of court identification testimony and the admission of the photo line-up. This emphasis is misplaced, however.

The Supreme Court set out significant guidance to specifically address similar assertions, as follows:

> In determining the admissibility of out-of-court identifications we have consistently followed the test of *Neil v. Biggers*, Our

formulation of the *Biggers* test was set out in *State v. Kennedy* as follows:

> In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Boyd, at 395, 280 S.E.2d at 678 (citing Syl. pt. 1, State v. Kennedy, W.Va., 249 S.E.2d 188 (1978), citing Syl. pt. 3, State v. Casdorph, W.Va., 230 S.E.2d 476 (1976) (internal citations omitted) (*emphasis added*).

The *Boyd* Court further extended the application of this analysis stating,

> [a]lthough the test in *Kennedy* is framed in terms of whether an out-of-court identification is so tainted as to require suppression of a subsequent in-court identification, footnote nine of the majority opinion in *Manson v. Brathwaite*, which clarified the application of the *Biggers* test, indicates that the same criteria should also apply in determining whether the out-of-court identification itself should be suppressed.

Id. at 395, 280 S.E.2d at 678 (internal citations omitted) (*emphasis added*).

In Petitioner's case, the victim testified that while inside the store, she turned and saw the Petitioner, in a doorway, coming towards her with a pole. *See* Trial transcript, Volume I, p. 165. She further testified that he closed to within two to three feet before striking her with the pole. *Id.* at 166. Then a struggle ensued over the money bags the victim had in her hand. *Id.* This struggle continued from the victim's office into the main part of the store. *Id.* at 162-167. The victim also testified that the Petitioner was wearing a hoodie, but no mask, and that during the altercation she could clearly see the Petitioner's face and part of his cornrowed hairstyle. *Id.* at 170-171.

Applying the factors of *Biggers* to these facts, the Court is of the opinion that the victim had more than an ample opportunity to observe the Petitioner as she watched him advance on her with a weapon and then struggled with him over the money bags. The Petitioner undoubtedly had the victim's undivided attention as she was in, what she perceived as, a struggle for her life. *Id.* at 168.

The Petitioner asserts, as he asserted in trial, that the victim gave greatly differing descriptions of her assailant following the crime. *See* Trial transcript, Volume I, pp. 182-187; *See also* OHCH transcript, pp. *14*-15, 47-48, 60, 93. *Trial Counsel*, however, testified that "[t]here were some slight inconsistencies." OHCH transcript, p. 14. The 911 center tape was not admitted as part of the record, and as such, the Court must thoroughly review the transcripts to determine the consistency of the descriptions given by the victim.

Chief Canterbury testified, that shortly after the incident, the victim initially described the assailant as a 6' 1", 170 pound, light complected black male, wearing a hoodie and jersey gloves. *See* Trial transcript, Volume I, p. 92. Under direct, and cross examination, the victim partially reiterated this same description. *Id.* at 170-171, 180-182. Detective James Sizemore testified that he had received the same description from Chief Canterbury shortly after the incident. *Id.* at 133.

*Trial Counsel* later attempted to question Ms. Castanon about the possible inconsistent statement given to the 911 operator during the following cross examination:

> Q: Can I first start of with asking, do you remember how many descriptions you gave to law enforcement as they were investigating this or --
> THE COURT: Or 911?
> Q: To 911 and the investigating officers, do you remember how many times they made you describe what was going on?

-34-

A: No, ma'am.

Q: We heard testimony today from law enforcement that you described your attacker as a light-skinned black man with a gray hoodie, sweat pants and gloves. Is that correct?

A: Yes.

Q: You also had the opportunity to describe to the 911 Center in your phone call to them - - after the attack happened, you had an opportunity and they asked you to describe your assailant. Do you remember that?

A: I remember talking to the 911 Center that day.

Q: Okay. And they asked you when - - if you could describe your attacker, and you did so. And I have a copy of the transcription of the 911 call. And if I could just refresh your memory, I will let you know what you reported to the 911 Center, and you can tell me if that's accurate. Okay?

A: Yes.

Q: Okay. The 911 Center asked you, "Is there anything you can tell me about this black male?" And you replied to them, "He is very, very black. Wore jersey gloves, brown-looking things."

Do you remember making that statement? Is it fair to say that you made that to the 911 Center?

A: Ma'am, I'm honestly - - I don't - - I'm not sure.

Q: Okay. All right. I know it happened right after the attack, so I understand where your memory might not be as good because of the trauma. But would you disagree with me that - -

MR. PARSONS: Your Honor, she can't disagree if she doesn't remember making the statement.

THE COURT: Well, I'm going to overrule the objection. If the 911 tape has you saying that, ma'am, do you dispute that you told 911 that?

A: No, Sir. That day was just very - - it was - - it was not a good day. I - -

Trial transcript, Volume I, pp. 182-184.

The 911 call was made shortly after the assault. Fear, adrenaline, and any other emotion imaginable, is flowing through an individual who has just experienced a life threatening event. From the record, it appears that the discrepancy in the description given to the 911 center and the

-35-

investigating officer, was minimal at best. And this is assuming that during this emotional onslaught, so close in time to the event, that what was heard or said, was as it was intended.

The majority of testimony adduced at trial shows no discrepancy in the description and appears to be an accurate reflection of the description given by the victim after the initial emotional flood had passed.

This Court is of the opinion that the discrepancy in Ms. Castanon's description of the Petitioner, if any at all, was minimal at best, and under the totality of the circumstances, the descriptions given were an accurate and consistent description of the Petitioner.

Next, this Court must address the level of certainty demonstrated by the witness at the confrontation. Ms. Castanon testified at trial that she had gotten a good look at the Petitioner. *See* Trial transcript, Volume I, p. 170. She testified that she picked the Petitioner out of the photo line-up and clearly indicated to the jury what photograph in the line-up she had picked. *Id.* at 172. Lastly, when Ms. Castanon was asked to identify who had attacked her during this incident, she readily pointed out the Petitioner and described him to the Court. *Id.* at 176.

This Court is of the opinion that Ms. Castanon displayed a high level of certainty, both in the use of the photo line-up, and in the courtroom confrontation, as to the identification of the Petitioner as her attacker.

Finally, this Court must address the length of time between the crime and the confrontation. Ms. Castanon testified that she relayed her description to law enforcement at the scene, within minutes of the robbery. *See* Trial transcript, Volume I, p. 170. Within hours after the robbery, Chief Canterbury incorporated the Petitioner's photograph into the photo line-up that was shown to the victim that same morning. *Id.* at 94-96. Further, Ms. Castanon identified

-36-

the Petitioner, less than a year later, at the jury trial that was conducted on December 10, 2009. *Id.* at 176. All of the foregoing occurrences were conducted in close time proximity to the robbery.

Based upon these facts, the Court is of the opinion that the reliability of the victim's out of court identification and subsequent in court identification, were unaffected by the minimal passage of time.

Based upon the totality of the circumstances and having applied the five factors of *Biggers* to the facts in Petitioner's case, this Court is of the opinion that even if the photo line-up was overly suggestive, there was not a very substantial likelihood of misidentification, and as such, the credibility of the eyewitness testimony was an issue properly weighed by the jury. *See* State v. Boykins, 173 W. Va. 761, 767, 320 S.E.2d 134, 139 (1984).

In addressing *Trial Counsel*'s motion for a directed verdict, this Court found Ms. Castanon's identification testimony both, admissible and not so outrageous or unreliable that it should not be left for a jury to determine the weight and credibility it should be given. *See* Trial transcript, Volume I, p. 195. This Court, like the U.S. Supreme Court and the West Virginia Supreme Court of Appeals, was "content to rely upon the good sense and judgment of [Petitioner's jury], for evidence with some element of untrustworthiness is customary grist for the jury mill." Id. at 767, 320 S.E.2d at 139-140 (citing Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140, 155 (1977) (alteration from original). "Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." Id.

Petitioner's jury weighed the identification evidence and found the victim's identification testimony reliable. This Court does not disagree.

Based upon all of the foregoing, this Court **FINDS AND CONCLUDES** the following:

1. The photo line-up was not suggestive and was created consistent with the suggestions outlined in W. Va. Code, § 62-1E-2.

2. The photo line-up was constitutionally sound and admissible.

3. *Trial Counsel's* performance in failing to object to the admission of the photo line-up and the out of court identification of Petitioner, when both were based, at that time, upon the hearsay testimony of Chief Canterbury, was deficient under an objective standard of reasonableness and thereby meets the first prong of the *Strickland* test.

4. Ms. Castanon's testimony established a proper foundation and confirmed the admissibility of the photo line-up and out of court identification.

5. The out of court identification was both reliable and admissible under the *Biggers* test.

6. The in court identification was both reliable and admissible under the *Biggers* test.

7. The Petitioner's fourth contention is without merit because the second prong of *Strickland* was not met as the Petitioner has failed to establish that, but for *Trial Counsel's* failure to challenge the admission of the photo line-up and out of court identification, the result of the jury trial would have been different.

5. **Failure to put on evidence concerning blood samples and foot or shoe size from the scene**

Petitioner contends that *Trial Counsel* was ineffective because she did not put on any evidence concerning blood samples and foot or shoe size from the scene, which could have been presented in the defense of the Petitioner.

State's witness, Mount Hope Chief of Police, Howard Mitchell Canterbury, testified during the trial in this matter, that while conducting a survey of the scene shortly after the incident, he observed a broken mirror and blood on the floor. *See* Trial transcript, Volume I, p. 78. He further testified, during the identification of a photograph of the scene, that "I'm looking at a blood stain, and it appears to have a footprint through the blood stain, or something has gone through the blood stain." *Id.* at 83 (identifying State's exhibit 10).

State's witness, Lisa Castanon, later, during direct examination, provided the following testimony about this blood stain:

Q: And was there a time when he overwhelmed you and you went down?
A: Yes. I was pushed into an end cap of mirrors. I had a display of wall mirrors on the end of an end cap of the aisle, and I was pushed into those. My head actually broke four of the mirrors, and then I went to the floor.
Q: And I'm going to show you what has been admitted into evidence as Exhibit 8. Can you take that please?
A: (witness complies.)
Q: Do you recognize Exhibit 8?
A: Yes.
Q: What's shown in Exhibit 8?
A: It's the entrance to the break room and the mirrors on the floor.
Q: Are those the mirrors that you just testified to that the defendant pushed you into?
A: Yes.
Q: And could you hand her the Exhibit with the blood? I don't know what number it is. Excuse me.
   Clerk Whisman: No. 10.
Q: I'm going to hand you Exhibit 10, ma'am. Do you recognize that?

-39-

A: Uh-huh.

Q: What's shown in Exhibit 10?

A: My blood on the floor.

Q: And from where were you bleeding, ma'am?

A: The whole side of my face.

Trial transcript, Volume I, pp. 167-168.

State's Exhibit 10 is a close-up photograph of an approximately one foot by one foot floor tile with an approximately three inch by three inch blood stain on it. A close inspection of the photograph reveals that the blood stain appears to be smeared, but there is nothing to indicate there is a footprint, or any identifiable mark in the stain.

Ms. Castanon testified that this was *her* blood from where she was assaulted and knocked to the floor. *Id.* at 168. Chief Canterbury rather inconclusively testified that it was a blood stain that appeared to have had *something* go through it. *Id.* at 83.

This Court fails to see how evidence of this smeared blood stain could somehow be helpful to Petitioner's case, nor can this Court see how *Trial Counsel* was deficient in her decision that it was unnecessary to further elicit testimony to explore the smeared blood stain, or lack of a footprint therein.

Based upon the testimony adduced at trial and a thorough review of the record, the Court FINDS that the origin of the blood was sufficiently explored at trial and there were no identifiable marks contained therein that would have been helpful, or harmful, to Petitioner's case. The Court further FINDS and CONCLUDES that Petitioner's contention that *Trial Counsel* was ineffective because she failed to put on any evidence concerning blood samples and foot or shoe size from the scene is without merit and fails to establish that *Trial Counsel's* performance was deficient under an objective standard of reasonableness.

6. **Allowing the testimony of State's Witness, Det. Sizemore, to stand, without any objections, as to his "expert" testimony concerning the mace components**

-40-

Petitioner asserts that *Trial Counsel* was ineffective because she allowed the testimony of State's Witness, Det. Sizemore, to stand, without any objections, as to his "expert" testimony concerning the mace components.

"In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions." Syl. Pt. 5, State v. Miller, 194 W. Va. 3, 6, 459 S.E.2d 114, 117 (1995) (citation omitted). This Court will only look at the circumstances to determine "whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Id. at 16, 459 S.E. 2d at 127.

The following testimony was adduced at the omnibus habeas hearing:

Q: How about a pretrial hearing in regard to the expertise of Detective Sizemore and this spray can expertise that he's supposed to have?
A: I don't remember Detective Sizemore having any kind of expertise, which is why I called my own expert.
Q: Well, he's the one that, my understanding in reading this, - - and sometimes I can get confused, too - - but he's the one who took Tony into a room and put some kind of light on him and said, "This means something." And he was allowed to testify to that without ever qualifying as an expert.
A: Right. But that's not expert testimony. He was - - he was testifying to what he saw, I believe, and - -
Q: He was testifying that he used - -

. . . .

Q: My understanding was that he was testifying as to an experiment he conducted based upon his expertise in ultraviolet light style things.
A: You mean by shining the light on Mr. Walton and that making him an expert on - -
Q: He gave an opinion based upon that experiment that he ran, and he was never - - he gave some qualifications, but he was never qualified by

-41-

the Court. The Court never accepted him, and you never challenged him, as being an expert? Is that correct?

A:     Yes, that's correct.

OHCH transcript, pp. 32-33.

At Petitioner's trial, *Trial Counsel* elicited the following relevant testimony during the cross examination of Detective Sizemore:

Q:     Detective Sizemore, the alternative light source testing is specific to a certain chemical that fluoresces; is that correct?

A:     No, ma'am. Not a specific chemical.

Q:     Or a chemical that will fluoresce, in this - - for this purpose.

A:     For this purpose, what we're looking at is the marker dye that is contained within the can of OC, or pepper spray. Now, I don't know if it's a specific chemical or a combination of it. I'm not a chemist. But I know what it does under an alternate light source.

Q:     So what it is doing is detecting a wave length.

A:     Yes, ma'am.

Q:     Okay. It's not actually detecting a chemical. It's detecting a light produced by a chemical.

A:     No, ma'am. It's a specific wave length of light, and you're exposing it to a chemical, chemical or chemical compound, that is designed to fluoresce when exposed to a specific wave length of light.

. . . .

Q:     When you do the alternative light source testing, it's to test the wave length that reflects. Is that correct?

A:     No, ma'am. The alternate light source puts out a specific wave length of light. It - - you're not testing the wave length. You're using a specific wave length of light to see if a compound or chemical will fluoresce when exposed to that. So what you're testing for is the presence of the marker dye that is invisible to the naked eye unless it is exposed to this wave length of light.

Q:     But it doesn't test what actual chemical.

A:     No, ma'am. I can't tell you that it's methyl ethanol butane, for example.

Q:     That's what I was trying to get to. I'm sorry. I apologize for going round about with that. So, really, what an actual chemical analysis

will tell you is what the chemical is that is there, specifically, if it - - if there at all.

A: Yes, ma'am. If I had taken a slice from Mr. Walton's skin and submitted it to a laboratory to see if they could run a specific chemical test for the components in a marker dye, it's possible they could tell you exactly what the chemical make-up of that dye is. I can't do that.

Trial transcript, Volume I, pp. 142-145.

Photos were taken by Detective Sizemore during the alternative light source tests that were conducted on the Petitioner. *Id.* at 130-131. These photographs were unsuccessful in capturing the "green glow" that Detective Sizemore testified he had seen while conducting the tests. *Id.* Detective Sizemore had also taken swabs of the Petitioner's face during this testing. *Id.* at 136-142. *Trial Counsel* had secured an expert to testify, during Petitioner's case in chief, about chemical tests that were independently conducted on these swabs wherein no chemical compounds consistent with pepper spray were discovered. *See* Trial transcript, Volume II, pp. 7-22.

*Trial Counsel*, like this Court, did not consider Lieutenant Sizemore's testimony to be expert testimony. *See* OHCH transcript, pp. 32-33. Further, it is clear to this Court, considering the photographic evidence and defense's expert testimony, that it was a strategic decision to elicit the testimony of Lieutenant Sizemore in an attempt to lend credence to the defense's overarching theory that the police had arrested the wrong person. *See* Trial transcript, Volume II, pp. 84-92. *Trial Counsel*'s conduct cannot be said to be deficient, or outside the realm of reasonably competent assistance, under the given circumstances. *See generally* Syl. Pt. 5, <u>Miller</u>, at 6, 459 S.E.2d at117.

Further, Petitioner attempts a distinction without a difference. Even if this Court accepts that Lieutenant Sizemore's testimony was expert testimony and that *Trial Counsel* was deficient

-43-

in her failure to require the State to seek to have Lieutenant Sizemore declared an expert, Petitioner's ineffective assistance of counsel claim still fails under the second prong of *Strickland*.

Lieutenant Sizemore provided substantial testimony as to his qualifications in the use of an alternative light source. *See* Trial transcript, Volume I, pp. 120, 122-123. Had *Trial Counsel* objected, it is likely that the Court would have qualified him as an expert witness in alternative light source technology. Petitioner has simply provided no proof that would show this Court that if Petitioner's *Trial Counsel* had required the State to have Detective Sizemore declared an expert witness, there was a reasonable probability that the results of the proceeding would have been different. *See generally* Syl. Pt. 5, Miller, at 6, 459 S.E.2d at117.

As this Court has already stated, the strategic advantages of having Lieutenant Sizemore's testimony available for support of Petitioner's theory of the case, far outweighed any benefit that he may have derived from *Trial Counsel* objecting to the testimony as outside the confines of lay testimony.

Based on the foregoing, the Court **FINDS** and **CONCLUDES** that Petitioner's sixth contention is without merit as it fails to establish either, that *Trial Counsel's* performance was deficient under an objective reasonableness standard, or that there is a reasonable probability that but for *Trial Counsel's* error, the results of the proceeding would have been different.

7. **Failure to properly react to the Judge's action upon the question by a jury member and to the Court's reprimanding of individuals in the courtroom who were perceived to be "friends" of the Petitioner**

-44-

Petitioner asserts that *Trial Counsel* was ineffective because she failed to "properly react" to the Judge's action upon the question by a jury member and to the Court's reprimanding of individuals in the courtroom who were perceived to be "friends" of the Defendant.

## A. Communications to the Judge by a jury member

This Court will first take up the issue of the Judge's reaction to communications from a jury member.

On two different occasions during the Petitioner's trial, a juror notified the Court of an issue. *See* Trial transcript, Volume I, p. 117 (showing communication during trial); *See also* Trial transcript, Volume II, p. 103 (showing communication during deliberations). Petitioner alleges that his *Trial Counsel* was deficient because she did not properly address these communications. *See Losh List*, p.2, subsec. g; *See also* OHCH transcript, pp. 48-51, The Court will address these two communications separately because they occurred at different stages of the trial and involve significantly different issues.

### a. Juror communicating, during trial, that she knew some of the spectators who were present in the gallery

The first communication brings into question whether a juror was qualified to sit on the jury when, after the trial began, she recognized some of the spectators as people she knew.

When obtaining a jury, the overall objective is to secure persons whose minds are free from bias or prejudice either for or against the accused. *See* State v. McClure, 400 S.E.2d 853, 184 W.Va. 418 (1990); *See also* State v. Curtin, 332 S.E.2d 619, 175 W.Va. 318 (1985); State v. Archer, 289 S.E.2d 178, 169 W.Va. 564 (1982). The trial judge acts as the gatekeeper to ensure that those jurors who are selected can perform their civic duty consistent with constitutional directives.

This gatekeeping function can be seen in the authority granted to trial judges pursuant to West Virginia Code and the West Virginia Rules of Criminal Procedure. *See generally* W. Va. Code Ann. § 56-6-12 (delineating specific issues for inquiry into qualification); W. Va. Code Ann. § 52-1-8 (authorizing the court to determine qualifications based upon competent evidence); W. Va. R. Crim. P. 24(a) (placing with the court the discretion of determining how juror examination will be conducted).

The Supreme Court has previously ruled on varying issues that may, or may not, affect a determination of whether a juror is qualified. *See* State v. Deskins, 380 S.E.2d 676, 181 W.Va. 112 (1989 ) (upholding qualification of an occasional jail maintenance man); White v. Lock, 332 S.E.2d 240, 175 W.Va. 227 (1985) (determining a juror and party having a common employer was not prima facie disqualification); State v. Dephenbaugh, 145 S.E. 634, 106 W.Va. 289 (1928) (entertaining opinion as to accused guilt not controlling in determining qualification); State v. Maynard, 289 S.E.2d 714, 170 W.Va. 40 (1982) (noting father of magistrate was not disqualified from jury service); State v. Hardway, 385 S.E.2d 62, 182 W.Va. 1 (1989) (establishing juror who was first cousin to husband of chief office deputy sheriff was not per se disqualified from serving as juror in murder trial); State v. Perdue, 372 S.E.2d 636, 179 W.Va. 719 (1988) (finding juror's familial relationship with nontestifying law enforcement officers did not per se disqualify juror from trial); State v. White, 301 S.E.2d 615, 171 W.Va. 658 (1983) (upholding qualification of juror who had casual relationship with state trooper who took statement from defendant); State v. King, 396 S.E.2d 402, 183 W.Va. 440, 12 A.L.R.5th 1115 (1990) (finding that jurors friendship with a trooper who was the key witness for the state, did not require trial court to remove for cause); *See Contra* State v. Swafford, 524 S.E.2d 906, 206

W.Va. 390 (1999) (establishing kinship to either party to the ninth degree is prima facie grounds for disqualification); State v. Hatfield, 37 S.E. 626, 48 W.Va. 561 (1900) (finding no error in excluding juror who has a blood or marriage relationship with the defendant).

Once potential bias or prejudice has been revealed, the Court must then determine whether actual bias or prejudice exists necessitating the removal of the juror. *See generally* State v. Bates, 380 S.E.2d 203, 181 W.Va. 36 (1989); *See also generally* State v. Knotts, 421 S.E.2d 917, 187 W.Va. 795 (1992); State v. Satterfield, 457 S.E.2d 440, 193 W.Va. 503 (1995). This ultimate determination of whether a juror is qualified for service lies with the discretion of the court. *See* State v. Mills, 219 W. Va. 28, 33, 631 S.E.2d 586, 591 (2005) (stating deciding court was in the best position to determine juror qualification) (citing State v. Miller, 197 W. Va. 588, 476 S.E.2d 535 (1996)); State v. Phillips, 194 W.Va. 569, 590, 461 S.E.2d 75, 96) (1995) (giving deference to the trial court's determination of whether juror qualified, or not) (overruled on other grounds); State v. Linkous, 194 W. Va. 287, 292, 460 S.E.2d 288, 293 (1995) (stating trial court's determination is not subject to review except when discretion is clearly abused) (*citing* Syl. pt. 5, State v. Derr, 192 W.Va. 165, 451 S.E.2d 731 (1994); State v. Lassiter, 177 W. Va. 499, 503-04, 354 S.E.2d 595, 599-600 (1987) (finding that it was not an abuse of discretion for the court to conduct the voir dire itself); Wade v. Chengappa, 207 W. Va. 319, 322, 532 S.E.2d 37, 40 (1999) (noting the general rule that the determination of juror bias or prejudice is left to the discretion of the trial judge) (citing State v. Gargiliana, 138 W.Va. 376, 76 S.E.2d 265 (1953)).

The mere fact that a juror recognizes spectators in a courtroom, regardless of whether they are there to support the accused or the victim, does not operate to disqualify that juror from

sitting on the jury. *See generally,* State v. Mills, 654 S.E.2d 605, 221 W.Va. 283 (2007) (noting that discovering during trial that juror knows a witness does not operate to disqualify). Further, the fact of acquaintance, or even a close friendly relationship, with a courtroom spectator is not recognized as so fraught with the potential for bias or prejudice, that a trial judge is required to delve into that issue during jury qualification examination. *See generally* W. Va. Code, § 56-6-12; *See also generally* State v. Curtin, 175 W. Va. 318, 321, 332 S.E.2d 619, 622 (1985) (explaining, in part, that voir dire is for the purpose of securing jurors who are not interested in the cause and not related to a party).

In Petitioner's trial, after the Court had adjourned for lunch on the first day, a juror advised the court reporter that she knew some of the spectators in the courtroom, and wanted to know whether that was something that she needed to disclose to the Court. *See* Trial transcript, Volume I, p. 117. Upon resuming the afternoon session, out of the jury's presence, the Court advised the parties of this communication and gave the parties an opportunity to address the issue. *Id.* State's counsel and Petitioner's counsel were both in agreement that there was no need to take up the issue based upon a juror knowing a spectator in the trial. *Id.* at 117-118. The Court reiterated that, during voir dire, the jurors had indicated that they did not know the witnesses or the parties and, that they could be fair and impartial in the trial. *Id.* at 118. The Court further iterated that the mere fact that a juror may know or be acquainted with a spectator would not be a basis to disqualify the juror. *Id.* The Court then brought the jury back into the courtroom and proceeded with the afternoon session. *Id.*

This is West Virginia, where the towns are small, and the jury pools are smaller. Many rural areas in West Virginia have a very low population. In many areas of West Virginia, the

-48-

citizens of any particular county, are likely to be familiar, or acquainted, with a large portion, if not most, of the other citizens in the county. That is simply a matter of mathematics.

If this Court were to favor Petitioner's view, it would be virtually impossible to seat a jury in many rural counties. Additionally, the Court would have to require that a list of all spectators and supporters be provided by the parties prior to seating a jury, so that the jury could answer whether they were acquainted with any supporters that may be in attendance during the course of the trial.

Further, this would literally swing the door wide open on motions for mistrials and post-trial allegations. This Court cannot fathom how easy it would be for an accused to bring every possible friend and acquaintance to their trial, in attempt to ensure that, if the trial did not progress as they had hoped, bias and prejudice could be argued due to some relationship being established between one of the spectators and a juror. *See generally* State v. Mayle, 178 W. Va. 26, 30, 357 S.E.2d 219, 223 (1987) (noting similarly in circumstances where a jury is threatened); *See also* State v. Dye, 171 W.Va. 361, 298 S.E.2d 898 (1982).

When this issue was raised by the juror in Petitioner's trial, the Court determined that the juror's qualification was in no way affected by the fact that she recognized spectators in the gallery. *See* Trial transcript, Volume I, p. 118. The Court was cognizant of the fact that all jurors had been questioned as to their relationships with witnesses or parties, and that all jurors had indicated that they could make a decision, without bias or prejudice, based upon the evidence presented to them. *Id.* Under the circumstances, this Court does not believe that any of the juror's affirmations to review the evidence without bias or prejudice was in any way altered by the juror's recognition of spectators in the gallery. *See* State v. Miller, 476 S.E.2d 535, 197

-49-

W.Va. 588 (1996) (noting that the Supreme Court must pay due respect to the oaths and affirmations of jurors when evaluating juror bias).

This Court is of the opinion that a juror's qualification to set on a jury is not called into question just because a juror recognizes a spectator in a courtroom, even if that spectator is a member of one of the parties' family. The Court was, and still is, of the opinion that based upon the circumstances, the possibility of bias or prejudice, to either party, was non-existent. *See generally* Wade v. Chengappa, 532 S.E.2d 37, 207 W.Va. 319 (1999) (leaving the determination of bias or prejudice to the discretion of the trial judge).

In applying the aforementioned discussion to Petitioner's ineffective assistance of counsel contention, this Court must look to what was known and reasonable at the time Petitioner's *Trial Counsel* was confronted with this issue. *See* Legursky, 195 at 317, 465 S.E.2d at 419. As this Court has previously discussed, the mere fact that a juror recognizes a spectator does not even allude to the presence of possible bias or prejudice, nor does it trigger some required response from a reasonably proficient criminal attorney. *See supra* discussion par. 1, p. 48.

The Court is of the opinion that Petitioner's *Trial Counsel* was not deficient for not further addressing the issue of a juror notifying the Court that she recognized some of the spectators in the gallery.

Even assuming arguendo that Petitioner had established that, under the circumstances presented, *Trial Counsel* should have been triggered to take further action on the issue, the Petitioner has presented no proof which would show that "but for" this failure, there was a

reasonable probability that the results of the proceeding would have been different. *See generally* <u>Strickland</u>, 466 U.S. at 695, 104 S. Ct. at 2068-69, 80 L. Ed. 2d 674.

### b. Juror communicating, during deliberations, that she knew the family and is now afraid of repercussions from the family

The second communication brings into question whether the Petitioner was prejudiced by the same juror, who had previously indicated that she recognized spectators in the gallery during trial, communicating to the judge, during the deliberation stage, that she was afraid of repercussions from the family and was unable to move forward in deliberations at this time. *See* Trial transcript, Volume II, p. 103.

The Petitioner asserts that *Trial Counsel* did not properly react to this communication, and as such his *Trial Counsel's* performance fell below that which is reasonably acceptable in the legal profession.

*Trial Counsel* vehemently argued for a mistrial when this issue presented itself during the jury's deliberations. *See* Trial transcript, Volume II, pp. 104-112. She further objected strenuously to any attempt to remedy this situation by the giving of a curative instruction to the jury. *Id.* at 108-109. The Trial Court, having heard the argument of counsel, denied the motion for a mistrial. *Id.* at 112. The Trial Court again denied *Trial Counsel's* motion for a new trial. *Id.* at 14. *Trial Counsel* did not move to individually question the jurors, at this time, but instead moved directly for a mistrial arguing bias and prejudice against the Defendant. *See* Trial transcript, Volume II, pp. 104-112; *See also* OHCH transcript, pp. 49-51. *Trial Counsel* preserved the issue for appeal. *See* Trial transcript, Volume II, p. 111. Once the judge had made a final ruling on the issue, and the issue had been preserved for appeal, *Trial Counsel* continued on in the proceeding. *See* OHCH transcript, p. 50. Additionally, *Trial Counsel* continued this

vehement pursuit of a new trial, on this same basis, during the Petitioner's sentencing hearing. *See* Sentencing transcript, pp. 4, 8.

The Supreme Court has recognized that "[t]he decision to declare a mistrial, discharge the jury and order a new trial in a criminal case is a matter within the sound discretion of the trial court." State v. Lowery, 222 W. Va. 284, 288, 664 S.E.2d 169, 173 (2008) (*citing* State v. Williams, 172 W.Va. 295, 304, 305 S.E.2d 251, 260 (1983)). Proficient trial counsel could have easily determined that once the Court had addressed the juror's communication, ruled upon the motion for a mistrial, and preserved the issue for appeal, that any further action on the issue would have simply been beating a dead horse.

The Court will not use hindsight to gauge whether *Trial Counsel's* manner of approaching the issue, may, or may not have been, more effective if approached differently. *See generally* Miller, 194 W. Va. 3, 459 S.E.2d 114. The Court must only determine, when viewing the circumstances as a whole, whether *Trial Counsel* acted outside the *wide range* of professionally competent assistance. *See* Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d 674.

Applying *Strickland* to the foregoing facts, this Court is of the opinion that *Trial Counsel's* reaction, when a juror communicated during deliberations that she was afraid of repercussions from the family, was not deficient when viewed under an objective standard of reasonableness and fell within the wide range of professionally competent assistance.

B. **The Court reprimanding spectators in the courtroom that were "perceived" to be friends of the Petitioner**

-52-

Petitioner further asserts that his *Trial Counsel* was deficient when she did not "properly react" when the Court reprimanded spectators in the courtroom who were "perceived to be friends of the Petitioner.

In addressing a court's power to control its proceedings, the Fourth Circuit has stated,

> [d]ue to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates. This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers.

United States v. Shaffer Equip. Co., 11 F.3d 450, 461 (4th Cir. 1993) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991).

The West Virginia Supreme Court, through its precedent, has further iterated a trial court's broad, inherent authority to handle exigent circumstances that may arise and disrupt the just and orderly progression of its proceedings. *See generally* Clark v. Druckman, 218 W. Va. 427, 624 S.E.2d 864 (2005) (noting the court's inherent authority to regulate and control the proceedings before it and to protect the integrity of the judicial system); *See also* State v. Hankish, 147 W. Va. 123, 126 S.E.2d 42 (1962) (mandating a duty on the court to facilitate the orderly progress of a trial); State v. Burton, 163 W. Va. 40, 54, 254 S.E.2d 129, 138 (1979) (noting a trial court is accorded considerable discretion in order to handle manifold exigencies that may arise).

During the trial, the courtroom was occupied by numerous spectators. Following the State's opening statement, the Court gave a general warning to the gallery concerning some spectators showing signs of approval or disapproval to what was being said during opening statements. *See* Trial transcript, Volume I, p. 52. The Court instructed all members of the

audience that this was a criminal jury trial and that they were welcome to observe the proceedings as long as their conduct was proper. *Id.* The Court further explained that showing signs of approval or disapproval was improper, and if continued, would result in the offending spectator being excluded from the courtroom. *Id.*

Later in the trial, the Court reprimanded two spectators for improper conduct during the trial. *See* Trial transcript, Volume I, pp. 177-179. The Court admonished these two spectators for disruptive conduct and continuing to make facial gestures after having been present when the Court had previously given its general warning against such conduct. *Id.* at 177-178. The Court reiterated that intimidating and disruptive conduct would not be tolerated. *Id.* at 179. All of this occurred *outside the presence of the jury*, as they had been released and had left the courtroom. *Id.* at 177.

Further, after receiving a note during deliberations that indicated that a juror was scared of repercussions from the family, the Court, out of the presence of the jury, advised all of the members of the audience against any unlawful acts under W.Va. Code § 61-5-27. *See* Trial transcript, Volume II, pp. 114-116. Upon being notified that the jury had arrived at a verdict, the Court, *outside the presence of the jury*, again warned all of the spectators that were present in the courtroom that, upon hearing the verdict, any demonstrations of favor or disfavor would not be tolerated. *Id.* at 116-117.

*Trial Counsel* correctly acknowledged during the omnibus habeas hearing that, although she could not specifically remember, it was highly unlikely that the judge had admonished spectators in the presence of the jury. *See* OHCH transcript, p. 41.

-54-

In Petitioner's case, aside from a general cautionary warning to the gallery during opening statements, the Court conducted its admonishments *outside the presence of the jury* and in the presence of the defendant.

The Court is obligated to ensure that the trial proceeds in an orderly, just, and impartial manner. In Petitioner's case, the Court took cautionary action to ensure that no manifest injustice was allowed to affect any of the trial's participants. Under these given circumstances, this Court fails to see how a reasonably proficient trial attorney would have reacted any differently than Petitioner's *Trial Counsel*.

Applying Strickland to the foregoing facts, the Court is of the opinion that, when the Court admonished spectators *outside the presence of the jury*, *Trial Counsel's* reaction was proper and was not deficient under an objective standard of reasonableness.

Based upon the foregoing analysis and facts, this Court FINDS the following:

1. *Trial Counsel's* reaction to the juror's communications to the judge was not outside the realm of reasonably competent assistance; and

2. *Trial Counsel's* reaction to the Judge's admonishment of spectators was not outside the realm of reasonably competent assistance.

The Court further FINDS and CONCLUDES that Petitioner's seventh contention that *Trial Counsel* was ineffective because she failed to "properly react" to the Judge's action upon the question by a jury member and to the Court's reprimanding of individuals in the courtroom who were perceived to be "friends" of the Petitioner, is without merit as Petitioner has failed to establish that *Trial Counsel's* performance was deficient under *Strickland's* objective standard of reasonableness.

## 8. Failure to question State's witness, Tony Castanon, about the confusing description of the attacker that was given to him by his wife, Lisa Castanon

Petitioner contends that *Trial Counsel* was ineffective because she failed to question State's witness, Tony Castanon, about the confusing description of the attacker that was given to him by his wife, Lisa Castanon.

The Petitioner alleges, in his *Losh List*, that *Trial Counsel* was ineffective for failing to question Mr. Castanon about the description his wife gave him of the attacker. *See Losh List*, subsec. h, p.2. However, during the omnibus habeas hearing, Petitioner alleged that *Trial Counsel* was ineffective because she failed to object to Mr. Castanon's description testimony on the basis of hearsay. *See contra* OHCH transcript, p. 42.

This Court will not rummage through the questionable clutter of Petitioner's contention. "[A] skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. Judges are not like pigs, hunting for truffles buried in briefs." State ex rel. Hatcher v. McBride, 221 W. Va. 760, 766, 656 S.E.2d 789, 795 (2007) (quoting State Dept. Of Health v. Robert Morris N., 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995)).

It is unclear whether Petitioner contends that his *Trial Counsel* should have elicited Mr. Castanon's hearsay testimony, or whether, his *Trial Counsel* should have objected to the State eliciting Mr. Castanon's hearsay testimony. The Court will approach this issue in a manner which will not require the Court to sort out what Petitioner's true contention is.

Mr. Castanon was questioned during direct examination as follows:

> Q:     All right. And so she called you. And then tell us what happened during this phone conversation.
> A:     Well, when she called me, she told me - - said she'd made it to work.
>        MS. KEARNEY:     Your Honor, I believe this calls for hearsay.

-56-

> THE COURT: Okay. What is it?
>
> MS. KEARNEY: This calls for hearsay, Your Honor.
>
> THE COURT: Overruled.

Trial transcript, Volume I, p. 60.

Mr. Castanon later testified during direct examination:

> Q: And did she describe to you or did you ask her for a description of who did this to her?
>
> A: She was trying to tell me what he looked like, what he was wearing, but, you know, I can't remember what color hoodie he was wearing.
>
> Q: So you were just mainly trying to console her at that point; is that correct?
>
> A: Right. Right.

*Id.* at 62-63.

"Where a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." State v. Cooper, 172 W. Va. 266, 270, 304 S.E.2d 851, 854 (1983) (citing Syl. Pt. 21, State v. Thomas, 157 W.Va. 640, 203 S.E.2d 445 (1974).

*Trial Counsel* initially objected to Mr. Castanon's direct testimony concerning a phone conversation that occurred between he and his wife, just prior to, and, during the robbery. *See* Trial transcript, Volume I, p. 60. This objection was overruled by the Court. *Id.* Later, during direct examination, Mr. Castanon's testimony indicated that, upon him arriving at the scene, Ms. Castanon was "trying to tell [him] what he looked like." *Id.* at 62. Mr. Castanon did not present any further testimony related to his wife's identification of the assailant.

The Petitioner assumes facts not contained within the record before this Court. This Court is unaware of what description was given to Mr. Castanon by his wife. Nor is it aware of whether or not Mr. Castanon was even capable of remembering the description. Further, this Court is unaware of whether any discrepancy existed between Ms. Castanon's descriptions, and any description she may, or may not, have given her husband.

This Court previously determined that the identification testimony offered by Ms. Castanon was reliable. *See supra Biggers* analysis pp. 33-37. *See also infra* discussion pp. 59. Mr. Castanon was on the phone with his wife when she was initially attacked. *See* Trial transcript, Volume I, pp. 60-61. He rushed to the scene and arrived there shortly before the police. *Id.* at 60-62. His wife was in a highly emotional state upon his arrival. *Id.* at 62. Like his wife, Mr. Castanon, knowing that his wife was presently facing a life threatening situation, was also experiencing the emotional onslaught that accompanies just such an event. *See supra* discussion para. 2, p. 36.

The Court fails to see how, under the circumstances, any possible discrepancy, assuming that one existed, could have been beneficial to the Petitioner's case. This Court further fails to see, under the circumstances given, how *Trial Counsel* was obligated, under a reasonably objective standard, to further explore Mr. Castanon's description testimony. Any testimony elicited could have just as easily been harmful, as opposed to helpful, to Petitioner's case. "There is much wisdom for trial lawyers in the adage about leaving well enough alone." Miller, at 16, 459 S.E.2d at 127.

The Court is unable to find that, under the given circumstances, a reasonably qualified defense attorney would not have acted as *Trial Counsel* did during the questioning of Mr. Castanon.

Based upon the foregoing, the Court **FINDS** that the Petitioner has made a skeletal argument that is unsupported by the record in this matter.

The Court further **FINDS** and **CONCLUDES** that Petitioner's eighth contention is without merit and fails under the first prong of *Strickland* as Petitioner is unable to establish that *Trial Counsel's* performance was deficient under an objective standard of reasonableness.

9. **Failure to put on any evidence about the varying descriptions of the attacker given by the victim to the 911 operator and to the police**

Petitioner contends that *Trial Counsel* was ineffective because she failed to put on any evidence to show the varying descriptions of the attacker given by the victim to the 911 operator, and in her written statement given to the police.

The Court hereby incorporates its prior analysis, related to any discrepancies in the descriptions given by the victim to the 911 operator and to the police, into its determination of Petitioner's ninth contention. *See supra Biggers* analysis pp. 33-37 (discussing the accuracy of witness' prior description).

Based upon this prior analysis, the Court **FINDS** that the descriptions given by Ms. Castanon to the 911 operator and the police, did not substantially differ.

When analyzing ineffective assistance of counsel claims, the West Virginia Supreme Court has previously stated, "[w]here a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense

-59-

attorney would have so acted in the defense of an accused." Cooper, 172 W. Va. at 270, 304 S.E.2d at 854 (citing Syl. Pt. 21, State v. Thomas, 157 W.Va. 640, 203 S.E.2d 445 (1974).

Petitioner testified that he had informed *Trial Counsel* that he wanted to put the 911 tape into evidence, although, he also testified that *Trial Counsel* had never provided him with a copy, or transcript, of the 911 tape and, prior to the trial, he had never heard the tape. *See* OHCH transcript, pp.86, 93, 95. Petitioner further asserts that his *Trial Counsel* did not put on *any* evidence about discrepancies in the descriptions given by the victim to the 911 operator and to the police. *Id.* at 93. This assertion is blatantly false. *See supra* cross examination pp. 35-36; *See also* Trial transcript, Volume I, pp. 181-187; OHCH transcript, pp.22-27.

*Trial Counsel* subjected Ms. Castanon to considerable cross examination on the issue of inconsistencies in her descriptions of the attacker. *See* Trial transcript, Volume I, pp. 181-187. *Trial Counsel* also utilized a transcript that her office had made of the 911 center tape, to refresh Ms. Castanon's memory during cross examination. *Id.* at 183, 188. *Trial Counsel* did not, however, enter the 911 center tape into evidence.

It is clear to this Court that it was a strategic and tactical move by *Trial Counsel* to cross examine Ms. Castanon by the use of a transcription of the 911 center tape, as opposed to the actual playing of the 911 center tape. *See* OHCH transcript, pp.22-27, 53-55. By using the 911 tape transcript, *Trial Counsel*, in her attempt to create reasonable doubt in the minds of the jurors, was able to adequately present the inconsistent description issue to the jury, without detrimentally affecting her client by the interjection of the emotionally charged tape. Further, the Court is of the opinion that, considering the minimal inconsistencies between the descriptions

given by the victim, *Trial Counsel* did a reasonably adequate job of attempting to exploit these slight discrepancies.

Based upon the foregoing, the Court FINDS that *Trial Counsel* put on evidence of the varying descriptions given by Ms. Castanon. The Court further FINDS and CONCLUDES that Petitioner's ninth contention that *Trial Counsel* was ineffective because she failed to put on any evidence to show the varying descriptions of the attacker given by the victim to the 911 operator, and in her written statement given to the police, is without merit and fails to establish that *Trial Counsel's* performance was deficient under an objective standard of reasonableness.

GROUND 2) Denial of Petitioner's Constitutional Right to A Trial of His Peers

Petitioner asserts, as his second ground for relief, that he was denied his constitutional right to a trial of his peers. As the basis for this assertion, the Petitioner relies upon the same facts and evidence put forth under the third contention of his ineffective assistance of counsel claim. *See supra* discussion pp. 18-25.

This Court, having applied *Duren*, and fully discussed the issue under Petitioner's ineffective assistance of counsel claim, hereby adopts its prior discussion and findings into the assessment of Petitioner's second ground for relief. *Id.* at 18-25.

Having previously found that the composition of Petitioner's venire, and jury, comported with constitutional requirements, the Court FINDS and CONCLUDES that Petitioner's second ground for relief is without merit because the Petitioner has failed to show that the jury he was provided, and the manner in which it was provided, was not in accordance with federal and state constitutional requirements.

-61-

## GROUND 3) Violation of Petitioner's Constitutional Rights When the State Used the "Photo Line Up" to Identify the Petitioner

Petitioner asserts, as his third ground for relief, that his constitutional rights were violated when the State used the photo line up to identify the Petitioner. As the basis for this assertion, the Petitioner relies upon the same facts and evidence put forth under the fourth contention of his ineffective assistance of counsel claim. *See supra* discussion pp. 26-39.

This Court, having applied Biggers to the facts and fully discussed the issue under Petitioner's ineffective assistance of counsel claim, hereby adopts its prior discussion and findings into the assessment of Petitioner's third ground for relief. *Id.*

Having previously found the out of court identification and photo line-up reliable and constitutional under the *Biggers* test, and that the photo line-up was developed consistent with the suggestions of West Virginia Code § 62-1E-2, the Court FINDS and CONCLUDES that Petitioner's third ground for relief is without merit as there were no federal or state constitutional impediments which would have prohibited the use of the photo line-up to identify the Petitioner.

## GROUND 4) Denial of the Petitioner's Constitutional Right to A Fair and Impartial Jury

Petitioner asserts that he was denied his constitutional right to a trial by a fair and impartial jury as his fourth ground for relief. The Petitioner alleges that his right to a trial by a fair and impartial jury was violated because of the following:

a) The Prosecuting Attorney's remarks to the jury prior to empanelment (*Losh List*, p.2, subsec. 1));

b) The Court's remarks to audience members who were present, who appeared to be there to support the Petitioner (*Losh List*, p.2, subsec. 2));

-62-

c) The Court allowing a juror who knew the Petitioner's family to serve on the jury (*Losh List*, p.2, subsec. 3)); and

d) The juror's statement to other jurors concerning his or her fear of Petitioner's family who he or she knew (*Losh List*, p.2, subsec. 4)).

The right to a fair trial is guaranteed by both the United States Constitution and the West Virginia Constitution. *See* U.S. CONST. amend. VI; U.S. CONST. amend. XIV; *See also* W.Va. CONST. art. III, § 14. Encompassed in the right to a fair trial, is the right to a fair and impartial jury. *See generally* State v. Stonestreet, 112 W.Va. 688, 166 S.E. 378 (1932).

The Court will now address each of the Petitioner's contentions in turn.

## A. The Prosecutor's remarks to the jury prior to empanelment

The Petitioner asserts that his right to a fair and impartial jury was violated due to the Prosecutor making improper remarks to the jury prior to empanelment.

"A judgment of conviction will be reversed because of improper remarks made by a prosecuting attorney to a jury that clearly prejudice the accused or result in manifest injustice." State v. Stephens, 206 W. Va. 420, 425, 525 S.E.2d 301, 306 (1999) (citing Syl. Pt. 5, State v. Ocheltree, 170 W.Va. 68, 289 S.E.2d 742 (1982)). Four factors are to be taken into consideration when determining whether prosecutorial remarks rise to the level requiring reversal of the conviction: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters. *See* State ex rel. Kitchen v. Painter, 226 W. Va. 278, 294-

95, 700 S.E.2d 489, 505 (2010) (citing Syl. Pt. 6, State v. Sugg, 193 W.Va. 388, 456 S.E.2d 469 (1995)).

At the omnibus habeas hearing, the Petitioner provided no additional proof of his contention beyond the trial record. The trial record reveals that the prosecutorial comments to which the Petitioner refers, were made during the jury empanelment phase of the Petitioner's trial. *See* Trial transcript, Volume I, pp. 8-9. The Court asked the prospective jurors whether there were any members who were unable to attend both days of the trial. *Id.* at 8. One prospective juror advised the Court that due to mechanical problems with her vehicle, she did not have transportation back and forth to the trial. *Id.* at 9. The Prosecutor interjected at this point and advised that, if necessary, the Sheriff's Department could transport the juror back and forth from the proceeding. *Id.* The Court rejected this offer and excused the juror from service. *Id.*

Applying the *Sugg* factors to the above facts, the Court is unconvinced that the Petitioner was clearly prejudiced, or that manifest injustice occurred, as a result of the prosecutor's comments. The remarks did not have the tendency to mislead the jury and prejudice the accused because they were unrelated to any evidentiary issue. Further, the remarks were an isolated incident that never occurred again during the trial. Also, as these remarks did not relate to the introduction of anything of evidential value, the strength of competent proof against the Petitioner was unaffected. Finally, since these comments occurred during the jury empanelment phase of the trial, it is clear that they were not made for the purpose of diverting the attention of the jury.

It is important to note that "[a] habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." Id.

-64-

at 648, 487 S.E.2d at 306, (citing Syl. Pt. 4, <u>State ex rel. McMannis v. Mohn</u>, 163 W.Va. 129, 254 S.E.2d 805 (1979)). Even if the prosecutor's comments were improper, they would constitute ordinary trial error, which does not rise to the level implicating state or federal constitutional rights. *See generally* <u>State ex rel. Wimmer v. Trent</u>, 199 W. Va. 644, 487 S.E.2d 302 (1997).

The Court **FINDS** and **CONCLUDES** the following:

1. The prosecutorial comments made during jury empanelment neither prejudiced the Petitioner, nor established manifest injustice,

2. Error, if any, would constitute ordinary trial error not reviewable under the relief offered under West Virginia Code §53-4A-1, and

3. The prosecutor's comments to the jury, during the empanelment phase of Petitioner's trial, did not violate the Petitioner's federal or state constitutional right to a fair trial.

**B. The Court's remarks to audience members who were present, who appeared to be there to support Petitioner**

The Petitioner asserts that his right to a fair and impartial jury was violated due to the Court making remarks to audience members, who appeared to be there in support of the Petitioner.

Pursuant to the West Virginia Constitution, "[t]he courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." W. Va. Const. art. III, § 17. To ensure that justice is administered consistent with this constitutional mandate, a judge "must ensure that appropriate action is taken to preserve a neutral and fair forum for all persons." W. Va. Trial Ct. R., 4.06.

Although the Petitioner couches his assertion in different language, this assertion is based upon the same facts and evidence put forth under the seventh contention of Petitioner's ineffective assistance of counsel claim. *See supra* discussion subsec. B, pp. 53-55. The Court, hereby, adopts its prior discussion and findings into the assessment of Petitioner's current contention. *Id.*

A judge occupies a very unique position, and as such, is naturally charged with the discretionary power and authority to control the orderly and fair progression of judicial proceedings. *See* State v. Burton, 163 W. Va. 40, 54, 254 S.E.2d 129, 138 (1979) (recognizing the discretionary authority granted to judges to deal with manifold exigencies that may arise); Illinois v. Allen, 397 U.S. 337, 343, 90 S. Ct. 1057, 1061, 25 L. Ed. 2d 353 (1970) (acknowledging that a judge has discretionary authority to address disruptive conduct in the courtroom). There is no one formula that a judge can apply to all situations that will ensure that an appropriate courtroom atmosphere is maintained. *See* Allen, 397 U.S. at 343, 90 S. Ct. at 1061, 25 L. Ed. 2d 353.

The combination of these mandates and precedential guidance operate to ensure that the right to the "fair trial" contemplated by the United States Constitution and the West Virginia Constitution is not infringed.

As was previously discussed by this Court, the only "remarks" that were made to the audience in the presence of the jury, was a general cautionary warning concerning how the audience was to conduct themselves in reaction to statements or testimony. *See* Trial transcript, Volume I, p. 52. This general cautionary warning was given to the gallery as a whole. *Id.* No specific audience members were singled out and this cautionary warning was given immediately

following the conclusion of the State's opening statement. As is clear by the trial transcript, the Court was unaware, at that time, who the offending audience members were there to support.

Later in the trial, due to the continued misconduct of some of the spectators, the Court admonished the offending audience members *outside the presence of the jury*.

The Court **FINDS** and **CONCLUDES** that neither the giving of the general cautionary warning in the presence of the jury, nor the admonishment of spectators outside the presence of the jury, operated in any manner to violate the Petitioner's right to a fair trial under the United States Constitution and the West Virginia Constitution.

**C. The Court allowing a juror who knew the Petitioner's family to serve on the jury; AND**

**D. The juror's statement to other jurors concerning his or her fear of Petitioner's family who he or she knew**

Petitioner asserts that his right to a fair and impartial jury was violated due to the Court allowing a juror who knew the Petitioner's family to serve on the jury. Along this same vein, the Petitioner also contends that his right to a fair and impartial jury was also violated due to this same juror making a statement to other jurors concerning his or her fear of Petitioner's family. Both of these contentions are intrinsically related, and as such the Court will address them collectively.

These assertions also relate to this Court's previous discussion under the seventh contention of Petitioner's ineffective assistance of counsel claim. *See supra* discussion subsec. A, B, pp. 45-55. The Court, hereby, adopts its prior discussion and findings into the assessment of the final two contentions under Petitioner's Fourth ground for relief. *Id.*

-67-

In its prior discussion, this Court cited numerous cases where a juror's qualification was called into question. *See supra* discussion pp. 46-47. In these cases, the possibility of bias and prejudice was much greater than the factual circumstances presented in Petitioner's case. *Id.*

Even where the possibility of bias and prejudice does present itself, "[t]he trial court is in the best position to judge the sincerity of a juror's pledge to abide by the court's instructions ." State v. Miller, 197 W.Va. 588, 606, 476 S.E.2d 535, 553 (1996) (citing State v. Phillips, 194 W.Va. 569, 590, 461 S.E.2d 75, 96 (1995)). It is within the Court's sound discretion, based upon the circumstances as a whole, to make a determination as to whether the juror should be disqualified and that determination will not be disturbed on appeal unless the Court's discretion is clearly abused. *See supra* discussion pp.47-48.

In *Miller*, the Supreme Court further addressed the trial court's evaluation of potentially biased jurors as follows:

> [A] trial court is entitled to rely upon its self-evaluation of allegedly biased jurors in determining actual juror bias. Moreover, even if there were some risk of prejudice, here it is of the type that [conceivably could have been] cured with proper instructions [as to the jurors' duty], and juries are presumed to follow their instructions. The trial court is in the best position to judge the sincerity of a juror's pledge to abide by the court's instructions; therefore, its assessment is entitled to great weight.

State v. Miller, 197 W. Va. 588, 605-06, 476 S.E.2d 535, 552-53 (1996) (citations and internal quotations omitted).

The *Miller* case, in pertinent part, involved the trial court refusing to strike, for cause, two jurors who had underlying prejudice against homosexuals. Id. The West Virginia Supreme Court went on to state that "the relevant test for determining whether a juror is biased is whether the

juror had such fixed opinion that he or she could not judge impartially the guilt of the defendant." Id. at 605, 476 S.E.2d at 552 (citations and internal quotations omitted) (alterations from original) (citing Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847, 856 (1984)).

The United States Supreme Court's test for determining juror bias is comparable to the test noted in *Miller*. See Reynolds v. United States, 98 U.S. 145, 155, 25 L. Ed. 244 (1878); *See also* Irvin v. Dowd, 366 U.S. 717, 723-24, 81 S. Ct. 1639, 1643, 6 L. Ed. 2d 751 (1961) (expounding upon the test established in *Reynolds*). Although all of these cases offer guidance, the *Dowd* Court offered the most accurate description of juror impartiality when it stated,

> [i]mpartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.

Id. at 724-25, 81 S. Ct. at 1643-44, 6 L. Ed. 2d 751.

It is for this reason that the United States Supreme Court and the West Virginia Supreme Court place significance on the burden being squarely on the shoulders of the trial court's judgment. *Compare* Reynolds, 98 U.S. at 156, 25 L. Ed. 244 (establishing trial court's determination should not be disturbed unless prejudice is manifest); *and* Holt v. United States, 218 U.S. 245, 248, 31 S. Ct. 2, 4, 54 L. Ed. 1021 (1910) (revisiting *Reynold's* deference to trial court's determination); *with* Miller, at 606, 476 S.E.2d at 553 (placing great weight on the trial court's assessment of juror bias); *and* State v. Phillips, 194 W.Va. 569, 590, 461 S.E.2d 75, 96) (giving deference to the trial court's determination).

The subject juror disclosed during the trial that she recognized some of the spectators in the courtroom. *See* Trial transcript, Volume I, pp.117-118. It wasn't until deliberations, that it

was discovered that the spectators were apparently the family of a party. *See* Trial transcript, Volume II, pp. 103-104. The Petitioner assumes that the juror was referring to a member of his family, although that was never determined. *See* OHCH transcript, pp. 48-49; *See also* Trial transcript, Volume II, pp. 110-111.

The Court recognized that the juror had indicated that she was afraid of repercussions for returning her verdict, not that she was impartial or induced to find one way or the other. *Id.* at 105-106. The Court also acknowledged that the jurors were questioned during voir dire and indicated that they were not related to any of the *parties*, did not know any of the *participants* in the trial, and could render a fair and impartial verdict based upon the evidence. *Id.* at 109, 113; *See also* Trial transcript, Volume I, p. 118. The Court gave the jury a curative instruction to remedy the situation. *See* Trial Transcript, Volume II, p. 112-114. Shortly after returning to deliberations, the jury returned with a verdict. *Id.* at 117.

The Court evaluated the circumstances and determined that the juror was not partial, biased, or prejudiced neither for, nor against, the Petitioner. This Court cannot accept Petitioner's assertion that the mere fact that a juror recognized family members, of *either party*, who were in attendance at the trial, operated to disqualify that juror from serving on the jury. *See supra* discussion pp. 48-50.

When, during deliberations, the juror disclosed that she was afraid of repercussions from "*the family*", the Court again, through a curative instruction, reiterated to the juror, and the jury as a whole, that it was to base its decision solely upon the evidence without fear or prejudice towards either party. *See* Trial transcript, Volume II, pp. 112-114.

On each of these occasions, the Court assessed the potential for bias or prejudice and found that potential lacking.

The Petitioner asks this Court to believe that the curative instruction opened the door to partiality, thereby permitting the jury to forget further deliberations and readily return a guilty verdict. The fact that following the curative instruction, the jury was out only a short time before returning its verdict, alternatively guides this Court to believe that fear was the only obstacle to the jury reaching its unanimous decision. The Court is of the opinion that, based upon the exigent circumstances that arose in Petitioner's trial, the Court took action that it deemed necessary and appropriate to ensure that the trial was fair for both parties.

The Court FINDS and CONCLUDES the following:

1. The subject juror did not know either of the parties or witnesses in the case;

2. The Court initially evaluated the juror and determined that she was not disqualified from serving on Petitioner's jury;

3. The subject juror's disclosure that she knew some of *"the family"* in attendance at the trial, did not operate to disqualify the juror from serving on Petitioner's jury;

4. The subject juror was not biased or prejudiced, neither for, nor against, the Petitioner;

5. The Petitioner's federal and state constitutional right to a fair and impartial jury was not violated when the Court allowed a juror, who knew some of *"the family"* members in attendance, to serve on the jury;

6. The subject juror's disclosure, during deliberations, that she was afraid of repercussions from the family, did not operate to prejudice or bias the other jurors, neither for, nor against the Petitioner;

7. The Court's curative instruction operated to ensure that the jurors' deliberations were not infected by bias, prejudice, or partiality;

8. The Petitioner has failed to show that his jury was biased or prejudiced against him; and

9. The Petitioner's Federal and State constitutional right to a fair and impartial jury was not violated when the subject juror disclosed to the other jurors that she knew some of "*the family*" in attendance and could not proceed with deliberations because she was afraid of repercussions.

Based upon the foregoing, the Court **FINDS** and **CONCLUDES** that Petitioner's contentions under Ground four, individually and collectively, are without merit and fail to establish that the Petitioner's federal, or state, constitutional right to a fair trial was violated.

**GROUND 5) Improper Jury Instruction Concerning Intimidation**

Petitioner asserts as his fifth ground for relief that the Judge committed error when the judge instructed the jury concerning the intimidation or harassment of a juror or witness in the course of their service.

As this Court discussed previously, a judge has the discretionary authority to address exigent circumstances that manifest during a trial. *See supra* discussion par. 3, p. 66. When these exigent circumstances arise, a judge must look to precedence and experience to determine how best to address the situation.

In *Allen*, the Supreme Court offered the following guidance in relation to notes received from a juror during deliberations:

> The proper method of responding to a written jury inquiry during the deliberations period in a criminal case, as we stated in State v. Smith, 156 W.Va. 385, 193 S.E.2d 550 (1972), is for the judge to reconvene the jury and to give further instructions, if necessary, in the presence of the defendant and counsel in the courtroom.

-72-

<u>State v. Allen</u>, 193 W. Va. 172, 173, 455 S.E.2d 541, 542 (1994).

Whether these additional instructions are proper "depends upon the facts and circumstance of the particular case and cannot be determined by any general or definite rule." <u>State v. Pannell</u>, 225 W. Va. 743, 745, 696 S.E.2d 45, 47 (2010) (addressing whether court's instructions constitute improper coercion of the jury) (citing Syl. Pt. 2, <u>State v. Spence</u>, 173 W.Va. 184, 313 S.E.2d 461 (1984)).

In Petitioner's case, a juror notified the Court that she was afraid of repercussions from family members who were in attendance at the trial. *See* Trial transcript, Volume II, pp. 103-104. This was an unusual circumstance that placed the Court in a quandary. *Id.* at 106-107. The Court determined that the best way to fairly address this issue was by giving the jury, as a whole, an instruction which would inform the jury that they are protected from retaliation for their service as a juror under West Virginia law. *Id.* at 112-113. The Court further incorporated into this instruction, a reiteration to the jury that they were to render a verdict based solely upon the evidence presented, without fear or prejudice toward either side. *Id.* at 114.

The Court provided the jurors with an accurate reflection of the law that protects them during their service as jurors. Also, to ensure fairness, the Court specifically instructed the jurors that this fear should not guide their deliberations and that their verdict must be based solely on the evidence adduced at the trial. The Court is of the opinion that it did not err in the giving of the additional instruction as it was an accurate reflection of the law and it was necessitated by the unusual circumstances that arose in Petitioner's case.

Even assuming arguendo that the Court did err in giving the additional instruction, this would amount to ordinary trial error. As the Supreme Court stated in *Mcmannis*, "[a] habeas

-73-

corpus proceeding is not a substitute for a writ of error and ordinary trial error not involving constitutional violations will not be reviewed. Syl. pt. 4, State ex rel. Mcmannis v. Mohn, 163 W.Va. 129, 254 S.E.2d 805 (1979), cert. denied, 464 U.S. 831 (1983).

This Court is of the opinion that this trial error, if it was error, would still not rise to the level that would implicate federal or state constitutional rights. *See generally* Edwards v. Leverette, 163 W. Va. 571, 576, 258 S.E.2d 436, 439 (1979).

Consequently, it is also important to note, that the Petitioner appealed this issue to the West Virginia Supreme Court of Appeals and the Court subsequently refused the Petitioner's appeal. *See* State of West Virginia v. Tony J. Walton, No. 100750 (Sept. 27, 2010).

Based upon the foregoing, the Court **FINDS** and **CONCLUDES** the following:

1. The Court did not err in giving the additional instruction to the jury;

2. Error, if any, would constitute ordinary trial error not reviewable under the relief offered under West Virginia Code §53-4A-1; and

3. Petitioner's federal and state constitutional rights were not violated when the Court gave the additional instruction on the protections afforded to jury members under W. Va. Code § 61-5-27.

## GROUND 6) Ineffective Assistance of Appellate Counsel

Petitioner asserts ineffective assistance of appellate counsel as his sixth and final ground for relief. The Petitioner alleges that his *Appellate Counsel* was ineffective on the appeal process because she failed to raise various issues which should have been raised.

The Petitioner presented no testimony or evidence in relation to his sixth ground for relief. Therefore, the Court **FINDS** said ground to be abandoned or waived.

-74-

Based upon the foregoing, the Court **FINDS** and **CONCLUDES** that the Petitioner's ineffective assistance of appellate counsel claim is without merit.

## 7) Grounds Not Asserted In the Losh List or By Way of the Omnibus Habeas Corpus Hearing

Petitioner asserted six (6) grounds for relief in his habeas petition and by way of the omnibus habeas corpus hearing.

W.Va. Code § 53-4A-1 et seq. contemplates that a person who has been convicted of a crime is entitled to only one post-conviction habeas corpus proceeding wherein all grounds for relief must be raised, that are known or which could, with reasonable diligence, be discovered. Syl. Pt. 1, Gibson v. Dale, 173 W. Va. 681, 683-84, 319 S.E.2d 806, 808 (1984). A petitioner may not, in a subsequent habeas petition, raise those grounds knowingly and intelligently waived in a prior proceeding. Syl. Pt. 2, id. at 684, 319 S.E. 2d at 809.

The Supreme Court has expressly addressed the res judicata effect of an omnibus habeas proceeding by stating the following:

> [j]udgment denying relief in post conviction habeas corpus is res judicata on questions of fact or law which have been fully and finally litigated and decided, and as to issues which with reasonable diligence should have been known but were not raised, and this occurs where there has been an omnibus habeas corpus hearing at which the applicant for habeas corpus was represented by counsel or appeared pro se having knowingly and intelligently waived his right to counsel.

Losh v. McKenzie, 166 W.Va. 762, 277 S.E.2d 606 (1981).

The Supreme Court further expressed that although a prior omnibus habeas corpus hearing is res judicata, to matters raised or that reasonably should have been raised, "an applicant may still petition the court on the following grounds: ineffective assistance of counsel at the

-75-

omnibus habeas corpus hearing; newly discovered evidence; or, a change in the law, favorable to the applicant, which may be applied retroactively." Syl. Pt. 4, id. at 762, 277 S.E.2d at 608. An omnibus habeas ruling is final and any subsequent petition will be summarily dismissed unless it addresses one of these three enumerated exceptions. Id. at 768, 277 S.E.2d at 611. "A judgment entered of record, remanding a petitioner after a hearing upon a writ of habeas corpus, which has not been reversed, is conclusive upon other application." Syllabus, State ex rel. Clevenger v. Coiner, 155 W. Va. 853, 188 S.E.2d 773, 774 (1972); Syllabus, State ex rel. Presty v. Lowe, 103 W.Va. 264; 137 S.E. 219 (1927).

At a hearing conducted by this Court on June 7, 2013, the Petitioner specifically informed the Court that the six (6) grounds alleged in Petitioner's *Losh List* were the only grounds being asserted in the habeas proceeding. *See supra* par. 8, pp. 10-11. The Petitioner was further informed that any grounds not asserted were waived. *Id.* The Petitioner advised the Court that he was satisfied with his habeas counsel, Thomas W. Kupec, Esq., and that he knowingly understood that he was waiving all other grounds. *Id.*

Based upon the foregoing, the Court FINDS and CONCLUDES the following:

1. The Petitioner, knowingly and with the assistance of counsel with whom he was well satisfied, waived all grounds not asserted at the Petitioner's omnibus habeas hearing;

2. The judgment of this Court is res judicata to all other matters raised in any habeas petition the Petitioner may subsequently file unless it is one of the enumerated exceptions outline in *Losh v. McKenzie*; and

3. This order is a final adjudication of all of Petitioner's contentions, he raised, or should have raised, in the Petitioner's omnibus habeas corpus proceeding.

-76-

THEREFORE, in consideration of all of the above, the Court is of the opinion to, and does hereby, **DENY** the relief sought by the petitioner in his *Petition Under W.Va. Code §53-4A-1 for a Writ of Habeas Corpus* and does hereby **DISMISS** this matter, with prejudice.

This is a **FINAL ORDER**. The Clerk is directed to remove this matter from the Court's active docket.

The Clerk is further directed to send an attested copy of this Order to: **Brian D. Parsons,** Assistant Prosecuting Attorney, 108 East Maple Avenue, Fayetteville, West Virginia 25840; **Thomas W. Kupec, Esq.,** 228 Court Street, Clarksburg, West Virginia 26301; **David Ballard, Warden,** Mount Olive Correctional Complex, One Mountainside Way, Mount Olive, West Virginia 25185; and **Tony J. Walton, Inmate Petitioner,** Mount Olive Correctional Complex, One Mountainside Way, Mount Olive, West Virginia 25185.

ENTERED this the 3rd day of February 2014.

PAUL M. BLAKE, JR.
JUDGE

_____
Judge Paul M. Blake, Jr.

A TRUE COPY of an order entered
04 February 2014
Teste: _Danielle Whitt_
Circuit Clerk Fayette County, WV

-77-